[Civil No. 3938.   Filed July 5, 1938.]

[81 Pac. (2d) 96.]

In the Matter of DODD L. GREER, a Member of the State Bar.

Mr. Urban R. Miller, for the State Bar.

Messrs. Wilson, Wood & Compton and Mr. Guy Axline, for Respondent.

LOCKWOOD, J.—In 1934 disciplinary proceedings were instituted by the State Bar of Arizona against

Isaac Barth, who was one of its members. In the course of the hearing many charges were made by Barth against Dodd L. Greer, hereinafter called respondent, who is a member of the Bar residing in Apache county. As a result of these charges, and of many other more or less loosely made accusations against the professional character of respondent, which were prevalent in that county, the State Bar ordered that an investigation be made. The first hearing, which was rather informal in its nature, was before a special local administrative committee of the Bar, meeting in Flagstaff, and respondent testified at length. The committee took the matter under advisement and finally concluded to have a formal hearing, which was held July 22 to 27, 1936, at St. Johns, respondent being present in person and by counsel. Many witnesses were examined and a great volume of documentary evidence accepted as exhibits, while, at the request of respondent, a transcript of the proceedings of the preliminary examination held in Flagstaff, also was admitted. After a consideration of all of the evidence before it, five charges were certified to the Board of Governors of the State Bar for further proceeding. Four of these pertained to alleged misconduct on the part of respondent as county attorney of Apache county, and the fifth, containing thirty-three subdivisions, referred to the alleged maladministration of the estate of Lucy Elia Castillo.

The Board of Governors met in Phoenix, Arizona, on January 26 and 27, 1937, respondent being present in person and by counsel. Further evidence was taken and the board then considered the matter. It dismissed the four charges of misconduct pertaining to respondent's acts as county attorney, and many of the specific charges of mishandling of the Castillo estate, but certified to this court thirteen of such acts as worthy of consideration. An order to show cause was

served on the respondent, and the matter finally came before us on oral argument on June 15th of the current year, neither the State Bar nor respondent desiring to present any further evidence, and was submitted for our decision.

Before proceeding to a consideration of the specific charges and the evidence, we think it best to make a brief general statement of the law applicable to disciplinary proceedings in the State of Arizona, as there seems to be more or less misunderstanding, even among members of the Bar, as to what such law is. The right to practice law is not a natural nor constitutional one, in the sense that the right to engage in the ordinary avocations of life, such as farming, the industrial trades and the mercantile business is. It has always been considered as a privilege only, bestowed upon certain persons primarily for the benefit of society, and upon such terms and conditions as the state may fix. The final determination as to what these conditions are, and who has satisfactorily complied therewith, is, and always has been, in the courts before which the individual practices his profession, and from time immemorial such individuals have been considered essentially and primarily as officers of the court admitting them. As was said by the Supreme Court of the United States, in *Ex parte Garland,* 4 Wall. 333, 378, 18 L. Ed. 366:

"Attorneys and counsellors are not officers of the United States; . . . they are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. . . . The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counsellors, and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the court, *and are responsible to it for professional misconduct. They hold their office during good behavior,* and can only

be deprived of it for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded. . . . '' (Italics ours.)

It is true that the legislatures of the various states may, and very frequently do, prescribe minimum qualifications which must be possessed by those who desire to apply to the courts for permission to practice, and the courts will require all applicants to comply with the legislative conditions. Such conditions, however, are not a limitation upon the right of the court to determine who may practice before it, but upon the individual citizen as such, and notwithstanding that an applicant may possess the qualifications required by the legislature, this does not entitle him to admission to practice, unless the court is also satisfied that such qualifications are sufficient. As was said in the case of *In re Bailey,* 30 Ariz. 407, 413, 248 Pac. 29, 30: ''In other words, they [the courts] may not accept less, but may demand more, than the Legislature has required.'' It necessarily follows that even if one has been admitted to practice because it is presumed he possesses the proper qualifications, he may be deprived of that privilege when he has shown by his conduct, either that the court was mistaken in assuming that he had them, or that he has lost them since his admission. Such deprivation may be either under the authority of a statute prescribing a specific cause therefor, or the court may act of its own inherent power. In determining whether a member of the Bar should be disciplined, there is no jurisdictional requirement when the proceeding is based on the inherent power of the court, and not upon some statutory ground, except that he may have the opportunity of appearing and being heard upon charges which are made known to him. *In re Bailey, supra.* In disciplinary proceedings, therefore, it is not necessary that it appear that the respondent has violated the

criminal code, or even that he has subjected himself to civil responsibility by virtue of his conduct. The ultimate test is whether, in the opinion of the court which hears and determines the question, it appears that the interests of society will no longer be served by permitting him to continue to practice his profession. Any conduct, therefore, which is unethical according to the standards of the legal profession is sufficient to justify such action as the court may think proper.

██ The ethical principles which should govern its members in their professional conduct have been set forth by the State Bar of Arizona. They are numerous, but the one involved in the present proceeding is stated as follows:

"15. . . .

"The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied. . . . "

As a corollary of this, he is bound to discharge his duties towards the client with the strictest fidelity, and to observe the highest and utmost good faith towards him, and if it appears that he has failed to do this, either through willful intent, gross negligence or professional ignorance, he is subject to discipline by the court, which discipline may even extend to denying him the right to further practice his profession.

██ When proceedings of this kind are initiated, we are required to sit not merely as judges of the law but as triers of the facts. It is an unpleasant duty which is imposed upon us, but one which we may not shirk, and our duty in the present case is, therefore, necessarily determined by whether the evidence satisfies us that respondent's conduct has so

violated his professional duty that he should be disciplined therefor, and if so, what form that discipline should take.

▮▮▮▮ The charge which we are considering is the maladministration of an estate by respondent. Obviously the principal source to which we would naturally go to ascertain whether this estate was properly administered is the records of the estate, as they are contained in the files of the superior court of Apache county. Upon examining such of these files as have been certified to us, and the evidence in regard to the balance, we find a situation which we can only characterize as appalling, and an indelible stain upon the administration of justice in that court. There is no evidence whatever that many of the things, which the law mandatorily requires should be done in the conduct of a probate proceeding, were ever done. Where there is, perhaps, some suggestion in the record that some of the requirements of the code were followed, it is not established in the manner required by law. There were many things done, or omitted, which show at the least gross ignorance of the proprieties to be observed by an administrator, and which at most give ground for a belief of much worse. The whole record shows the estate was handled in a manner that was characterized, even by one of the members of the Board of Governors who considered the charges as insufficient to certify to this court, as "terrible, no question about that." Most of the deficiencies in the record appear during the period in which respondent was either attorney for the administrator of the estate, or acted himself both as attorney and administrator. As instances of what we have said, he administered the estate for nearly seven years before he filed any inventory and appraisement. But one account and report was filed during that period, and many of the records which should show the details in regard to the

disposition of the property of the estate and its expenditures are missing. Vouchers for alleged disbursements, for which credit was claimed, were not found, and there were other discrepancies too numerous to mention. It is obvious that on this state of the record, it is almost impossible to ascertain by direct and affirmative evidence what actually happened. We think that since, as was admitted by counsel for respondent in open court, respondent was at the best grossly negligent in the conduct of the estate, it places the burden upon him to show affirmatively, and to the satisfaction of the court, a legitimate explanation of all suspicious circumstances, and that the presumption is that every transaction and every matter which cannot be so explained by him has no explanation which justifies his conduct.

The charges certified to us by the State Bar, and which the respondent had full opportunity to meet, refer to his conduct as attorney for the administrator of the estate of Lucy Elia Castillo, and as administrator of such estate. The specific charges are summed up in number XI, which reads as follows:

"That just a casual review of the conduct and administration of the said Estate discloses that he, the said Dodd L. Greer, both as administrator of the said Estate, and as attorney for the administrator, violated his trust, and that his conduct of said Estate, to say the least, was inconsistent with the best interests of his client, who spoke English brokenly, was easily influenced, and not very bright mentally, and who, in consequence of this relied upon the said Dodd L. Greer in a much greater degree than would have an intelligent person familiar with such duties,"
and we shall refer to the other twelve charges only as they may bear upon the one set forth above.

The record of this case is extremely voluminous; the greater portion thereof consists of exhibits which are immaterial, argument of counsel and discussion of va-

rious matters, but from the evidence we have come to the conclusion that the following facts are established. In stating them, in order that they may be intelligible, we think it advisable to do so in a narrative form, and to include a number of things which do not bear directly upon the alleged misconduct of respondent, for it is only by considering the entire administration of the Castillo estate that respondent's connection therewith can be either properly stated, or understood.

Nasif Tamer, a native Syrian, had been a resident of Apache county for many years, and by virtue of industry, thrift and intelligence had built up a considerable estate, the basis of his fortune being principally the sheep business. He died in 1916, leaving surviving him a wife, Elena Elia Tamer, and a daughter, Lucy Elia, who was married to Eduardo Castillo. Both the wife and daughter died in 1919. Considerable litigation followed their deaths, but eventually the daughter of Lucy Elia, Elena Castillo by name, became the sole heir to all the property of Nasif Tamer, and this property was handled until 1934 in probate in the superior court of Apache county in the estate of Lucy Elia Castillo. Eduardo Castillo, the husband of Lucy Elia, and the natural guardian of his daughter, Elena Castillo, according to the record spoke English only brokenly, had little or no experience in either law or business, and apparently was not particularly intelligent naturally, so that he relied upon others in the conduct of his affairs to a much greater degree than would an ordinary intelligent person, which fact was at all times well known to respondent. The superior court of Apache county appointed the Stockmen's State Bank, a corporation with its principal place of business situate in St. Johns, Arizona, the administrator of the estate, on April 15, 1919, and four days later the administrator qualified and filed its bond in the sum of $90,000. An inventory

and appraisement of the estate was filed a few days later, which showed a valuation of a little over $60,000. About $12,000 was in cash, $32,000 was in sheep running principally upon the open range, $9,000 was in real estate, and the balance consisted of various items of personal property. The bank continued as administrator until approximately 1923, when it became insolvent. Instead of promptly winding up the sheep business of the estate and reducing its assets to cash or securities of a kind generally approved for the funds of wards of the court, it continued in that business, although it is common knowledge that the sheep business is wholly speculative in its nature, and requires for success not only favorable conditions, but great skill, care and direct personal attention on the part of the operator. During this period there were some $12,000 of claims allowed against the estate, and a considerable amount of operating revenue secured from the sheep. After the bank became insolvent, Eduardo Castillo, the father of Elena, applied for letters of administration. Notwithstanding it should have been well known to the court what his lack of qualifications for such an important position were, letters were issued to him. The only possible excuse for such action by the court was that he was able to give a bond with sureties who were presumably amply worth the face of the bond, and were experienced sheepmen, and whom the court probably considered, on this account, would properly advise the administrator in regard to his conduct of the estate and its principal asset. The bank filed its final account and report, which showed approximately $24,000 of assets turned over to Eduardo Castillo as administrator, and some $23,000 of assets unaccounted for. Suit was brought against the bank for this amount, and a judgment was obtained for approximately $19,000. Of this judgment $12,000 was collected, some by credits allowed upon it

for various matters, some by payment by the bonding company which had been surety on the administrator's bond, and some by cash from the insolvent bank, leaving some $7,000 of the judgment not collected. In view of the size of the bank's bond and the undoubted solvency of its bondsmen, this seems strange. Eduardo Castillo filed an inventory and appraisement shortly after his appointment, which shows that apparently he had received, as assets of the estate, $40,000, including the judgment aforesaid. He administered the estate for about a year, the sheep business being continued by his bondsmen. During most of this period respondent was attorney for the administrator. After this time Eduardo Castillo was removed as administrator, for the reason that his bondsmen withdrew, and respondent was appointed as administrator on February 12, 1924, and qualified a short time later. He filed no appraisement nor inventory at that time, nor indeed until February 25, 1931, but an analysis of such records as remain in the probate files indicate that when the administration of Eduardo Castillo had terminated, there should have been on hand property which had been inventoried at approximately $27,000 of which $3,000 was apparently cash, $9,000 the value of the sheep remaining, $7,000 the balance of the judgment against the Stockmen's State Bank, and the remainder in miscellaneous assets. When, however, respondent filed his inventory and appraisement seven years after he had qualified as administrator, he showed only approximately $10,000 assets, a discrepancy of over $17,000, although since he had been attorney for Castillo, and presumably prepared his accounts, he should have known what became of the missing assets.

One of the assets of the estate received by Eduardo Castillo was a note of Saideh Baracoh, which was inventoried at $1,650. It was apparent that litigation

would be necessary to recover anything on this note, so respondent entered into an agreement with Eduardo Castillo that he would collect the note for a contingent fee of 50 per cent. This agreement was not approved in advance by the superior court, but was afterwards allowed by it as an item in one of the accounts. He engaged counsel in Albuquerque, New Mexico, to actually conduct the litigation, and after two trials there was a recovery of a gross amount of a little over $1,000. From this, the Albuquerque attorneys deducted 25 per cent., and a small amount of costs, and remitted to respondent, who was then administrator, the sum of $731.40. In his accounts, he charged, as a result of such litigation, $489 in expenses, and $500 for his contingent fee, making a net loss to the estate of $257.87, and yet, when he rendered an account thereof, this was approved by the court.

During the course of administration it was finally thought desirable that the remaining sheep owned by the estate should be sold. The records of the court are incomplete on this subject, but apparently a sale was ordered to be made for cash. A short time before, the estate had been offered some $13,000 for the sheep by responsible parties, which offer was refused. At the auction they were sold to one Marian Haws for $8,000. This, however, was not all paid in cash; $3,000 was paid at the time partially in cash and partially by a note of a third party, the remaining $5,000 being secured by a mortgage on the sheep themselves. All of the $8,000 was eventually paid and accounted for. Some time after the sale of the sheep, and before the payment of the mortgage, respondent entered into a partnership in these sheep with Haws, and continued for an indeterminate time as such partner. He also, as administrator, purchased from himself as administrator of another estate, certain stock in a corporation, which afterwards turned out to be worthless. This

purchase was made at a time when respondent should have known the company whose stock he purchased for the Castillo estate was at least in difficult circumstances.

The first attempt made by respondent to make any accounting of his acts as administrator was on January 6, 1925, when he filed his first account and report, in which he estimated that the value of the assets at the beginning of his administration was approximately $10,000, but made no inventory or appraisement of such assets. No further accounting of any nature was attempted by respondent until some four years later, on January 5, 1929, when he filed what he denominated a final account and report, no inventory having as yet been filed. This report, as filed, showed that he had in his possession as property of the estate, $1,200 in cash, a house and lot which had been purchased by him for $1,500, and some other assets of practically no value. The estate of $60,000 had thus shrunk in ten years to less than $3,000, although the record shows that the heir had received for her benefit and support during this entire period only about $10,000, a less sum than that paid by the estate during that period for attorneys' fees alone. Soon after this final account and report was presented, Eduardo Castillo, who had been appointed guardian of his daughter, being naturally dissatisfied with the situation, engaged counsel to enter objections to it. As a result of these objections, respondent filed an amendment to the final account and report on April 13, 1929, and a supplemental account and report on April 17, 1929.

On June 25, 1929, respondent and the attorney for the guardian entered into an agreement, whereby respondent agreed to pay individually, and the guardian agreed to accept, the sum of $4,200, in addition to the items which the respondent at that time showed by his accounts the estate possessed, on condition that the

guardian would withdraw any further objection to the account as rendered by respondent. Of this amount, $1,700 was paid in cash to the attorney for the guardian, and the other $2,500 was covered by an agreement on the part of respondent to pay such amount on June 1, 1930. The record shows that this $2,500 was never paid, and eventually, after the attorney for the guardian was no longer in a position to push his objections against the account as rendered by respondent, was repudiated by the latter. Thereafter the following supplemental reports were made by respondent: A supplemental account and report on December 5, 1930; a second amended final account and report on January 12, 1931; another second amended final account and report on March 12, 1931; a supplement to the second amended final account and report on July 10, 1931. The accounts of respondent were finally settled on January 26, 1934, it then appearing that the estate was indebted to respondent in the sum of $1,829. In order to make this showing, however, respondent charged against the *estate* the $1,700 which he had personally agreed to pay, and did pay, to Castillo in order to get him to withdraw his objections to the accounts as they stood in 1929. The record also shows that in some manner, and for some reason, the agreement to pay the $2,500 disappeared, and that respondent gave his promissory note in the sum of $1,040 to the guardian, payable at the rate of $20 per month. The reason for giving this is not apparent, except that respondent testified it was suggested by Judge Sawyer that he do so.

There were many other things in the record, which appear to have been serious irregularities at the least, but we think we need not go into them in detail.

What explanation does respondent give of the situation, as shown by the record? It can only be characterized as unsatisfactory and evasive. He was given

three opportunities to present evidence before the examiners chosen by the State Bar, so that he cannot complain he had not ample time to secure all obtainable evidence. His counsel substantially admitted that the evidence was vague and indefinite, but attempted to excuse it on the ground that it was impossible, after so long a lapse of time, to secure satisfactory testimony. Admitting this to be true, it seems to us that if respondent was guilty of nothing more than carelessness in the handling of the estate, a better showing could, and should, have been made.

The question before us then is whether all of these facts require that respondent should be disciplined by this court for his conduct, and if so, of what the discipline should consist. That the first question must be answered in the affirmative cannot be doubted. Indeed, counsel for respondent, in his oral argument, admitted that respondent had been guilty of disregard of the plain requirements of the statutes all through his handling of the estate, and gross negligence in keeping its accounts, but offered in extenuation of this situation the claim that respondent, at the time he first became connected with the Castillo estate, had just been admitted to the Bar, and was, in reality, nothing but an ignorant cowboy, and urged that his conduct was the result of ignorance rather than intent, and that he did not profit personally in any manner thereby, suggesting that he had since learned his duty and would doubtless perform it in the future, that the publicity and criticism to which he had already been subjected was sufficient punishment for his misconduct.

So far as the failure to make an inventory and appraisement when it was required, and to render the proper annual· accounts, and other similar violations of the probate code are concerned, this might, perhaps, be accepted as an excuse, but unfortunately there are

other more serious matters shown by the record. Respondent's conduct in regard to the Baracoh note transaction, wherein the estate suffered a loss of over $200, and respondent profited thereby to the extent of at least $500, while almost all of the work connected with the litigation was done by outside counsel, shows a disregard for the interests of his client much similar to that shown by the disbarred attorney in the Barth case. The purchase by him of the stock in the Springerville Mercantile Company from himself as administrator of another estate, when he should have known the condition of the company, is indicative of more than mere negligence accompanied by good faith. It would seem that even a layman should know that to make a sale of the most valuable assets of the estate to a third party on time, for a price less than had been previously offered him, and then to go into partnership with the purchaser of this asset before it had been fully paid for, was something that an attorney who knew his duties to his client, and desired to observe them, would have avoided as unethical in the highest degree. But even if we could, in some manner, condone these acts on the ground of the inexperience of the respondent, his conduct in connection with the final settlement of the estate is inconsistent with that required by the law of one who is permitted to practice that ancient and honorable profession. According to his own statements, made in his report of January 15, 1929, he owed the estate $1,200 in cash, and in addition had in his possession certain realty belonging thereto. Vigorous exception was taken to this report on the ground that he had maladministered the estate, and, in substance, had embezzled its assets. He found it necessary twice to amend his report and then, in order to cause the objections, which had already been made, to be withdrawn, he personally agreed to pay, not to the estate, but to the guardian of Elena Castillo, the sum of $4,200,

on condition that further objections cease and those made already be dropped. Such an agreement can be considered in no other light than an admission that his account, as rendered, was false, and that he owed the estate far more than he had shown by that account. Notwithstanding this, when his accounts were finally settled, he claimed the $1,700, which he had agreed to pay and had paid from his personal funds, as a credit in his final settlement with the estate. Nor did he live up to his agreement to pay the $2,500. In some mysterious manner, which throws grave suspicion upon respondent, this written agreement was taken from the possession of Eduardo Castillo, disappeared, and was thereafter repudiated, and no payment whatever made thereon, unless it be considered that the $1,000 note given by respondent to Castillo represents a second scaling down of his indebtedness to the estate. All of this was done after respondent had been practicing his profession for ten years, and after he knew his conduct of the estate had been most severely criticised.

We are compelled to hold that these acts cannot be excused nor condoned on the ground of mere ignorance and negligence, but that they show conclusively that respondent does not possess and act upon that standard of ethics required of those who are granted the privilege of practicing law before the courts of this state. It is the duty of this court to see that the conduct of those who practice before it is such that it gives no just cause for criticism by the public, and when, unfortunately, it appears that one of the members of the Bar has departed so far from proper ethical standards as the evidence in this case shows that respondent has, we can do but one thing.

It is our opinion justice requires that respondent should be disbarred from the further practice of law in this state, and such is the order of the court.

McALISTER, C. J., and ROSS, J., concur.