STATE BAR OF ARIZONA ET, APPELLANTS AND CROSS-APPELLEES, *v.* ARIZONA LAND TITLE AND TRUST COMPANY ET, APPELLEES AND CROSS-APPELLANTS.
LOHSE, APPELLANT, *v.* HOFFMAN ET, APPELLEE.

## Supreme Court of Arizona.

## No. 6724. Decided November 1, 1961.

*Mr. Darrell R. Parker* (deceased), *Mr. Leslie C. Hardy* and *Mr. John E. Madden,* Phoenix, for appellants.

*Messrs. Boyle, Bilby, Thompson & Schoenhair,* Tucson, for appellee and cross-appellant Arizona Land Title & Trust Co.

*Messrs. Perry & Perry,* Phoenix, for appellee and cross-appellant Arizona Title Guarantee & Trust Co.

*Messrs. Cunningham, Carson & Messinger,* Phoenix, for appellee and cross-appellant Phoenix Title & Trust Co.

*Messrs. Darnell, Holesapple, McFall & Spaid,* Tucson, for appellee and cross-appellant Tucson Title Insurance Co.

*Messrs. Jennings, Strouss, Salmon & Trask* and *Mr. William T. Birmingham,* Phoenix, for appellee Lane Title & Trust Co.

*Mr. Stephen B. Rayburn,* Phoenix, for appellee Ford Hoffman and C. L. Hoffman, dba Ford Hoffman Realty.

*Mr. F. Trowbridge vom Bauer,* Washington, D. C., *Mr. E. N. Eisenhower,* Tacoma, Wash., *Mr. Terrell Marshall,* Little Rock, Ark., *Mr. Raymond Reisler,* Brooklyn, N. Y., *Mr. Thomas J. Boodell,* Chicago, Ill., *Mr. Jonathan F. Ells,* Winsted, Conn., *Mr. H. H. Perry, Jr.,* Albany, Ga., and *Mr. Melvin F. Adler,* Fort Worth, Texas, for American Bar Association, as Amicus Curiae.

LOCKWOOD, Justice. The plaintiffs, the integrated State Bar of Arizona and certain attorneys individually and as members of the State Bar Committee on Unauthorized Practice, filed two complaints for a *declaratory judgment*. One was against the defendants Ford Hoffman and C. L. Hoffman, d. b. a. Ford Hoffman Realty, hereafter referred to as Hoffmans, the other against the Arizona Land Title & Trust Company, Arizona Title Guaranty & Trust Company, Lane Title & Trust Company, Phoenix Title & Trust Co., and Tucson Title Insurance Co., hereafter referred to collectively as the title companies, all Arizona corporations engaged in the land title insurance business, and in many instances also acting in other fiduciary or representative capacities, such as executor, administrator, trustee, broker, receiver, underwriter, depository and agent, general or escrow.

The essence of the complaint against the title companies is that they, acting by and through attorneys and other persons employed by them, in connection with the conduct of their businesses and transactions have been and are regularly and continuously preparing, drafting and formulating documents affecting title to real property for their numerous "clients, patrons, and customers," and giving legal advice regarding such transactions and instruments so drafted, constituting the unauthorized practice of law.

The complaint against Hoffmans alleges that *as real estate brokers and salesmen they procured the sale of an equity in certain real property, which was in escrow with a title company in Phoenix, Arizona, and thereafter prevailed upon the sellers to permit Hoffmans to handle the escrow by advising that they were competent and qualified to handle it and that the parties to the transaction would be as fully protected from a legal standpoint as if the escrow were handled by the title company.* The complaint further alleges that Hoffmans advised that they were competent and qualified to draft and prepare all the necessary *contracts, deeds, bills of sale* and *other instruments necessary to the transaction*; that the sellers per-

mitted the Hoffmans to handle the transaction, including drafting of certain instruments affecting the title to the real property, and that the Hoffmans charged $8.00 for drafting of the legal documents. Plaintiffs claimed that Hoffmans were illegally engaged in the practice of law, and prayed for a declaratory judgment to that effect, together with an adjudication holding them in contempt of court for unauthorized practice of law, together with an injunction restraining and enjoining them from doing any further acts of the same kind or character, *except preparation of the customary preliminary purchase agreement executed on printed forms prepared for such purpose.*

These consolidated cases went to trial, extensive evidence both oral and documentary was adduced, and the trial court entered numerous findings of facts and conclusions of law, and a judgment based thereon. It denied injunctive relief or any adjudication of contempt, as being unnecessary. It concluded that the inherent power to supervise all lawyers and all phases of the practice of law, is in the Supreme Court of this state; that the State Legislature may specify minimum qualifications for lawyers and grounds for discipline and disbarment, but may not curtail or limit the power of the court to control and supervise both court and office practice as well as certain aspects of the personal lives of the lawyers admitted to practice before the courts. It further found that the Canons of Professional Ethics (undoubtedly referring to those adopted by the American Bar Association) apply to all phases of the practice of law both by statute and by rule of the Supreme Court. The balance of the conclusions of law are chiefly devoted to an attempt to define "the practice of law" in a general sense, and to an enumeration of exceptions to certain "activities which are properly within the sphere and scope of the office practice of law" which the court determined might be engaged in by one other than a duly licensed attorney at law. The trial court based such conclusions on the proposition that such activities are necessary or proper incidents to the conduct of lawful business, (1) established by virtue of long-standing custom, or (2) under certain circumstances by legislation or court decision. In such enumeration of exceptions, the court approved some

of the conduct and activities of the several defendants, and disapproved others, entering its declaratory judgment in accordance therewith.

Plaintiffs appealed, assigning as error in the *Hoffman case* the court's holdings (1) that by statute there was a legislative intent that a real estate broker may engage in the basic aspects of conveyancing in relation to lands "sold" by him for his patrons, (2) that certain acts and conduct of the Hoffmans were "long-standing customary activities carried on by real estate brokers and salesmen in Arizona in connection with transactions in which they are brokers and salesmen, and incidental and customary activities of persons engaged in the real estate business," and (3) that Hoffmans as such licensed real estate brokers could properly, without being guilty of engaging in the unauthorized practice of law, continue to engage in such activities and conduct. With regard to the title companies, plaintiffs' assignments of error, addressed to certain findings of fact and conclusions of law, fall into two categories, viz., that the court thereby (1) approved the practice of law by a corporation, when consisting of acts and conduct incidental to the general business of the corporation, and (2) found that it is in the public interest and consistent with the established and long existing business and economic customs that the title companies be permitted to conduct their respective businesses as they have in the past, subject to some specific limitations.

Each of the title companies, except Lane Title & Trust Co., filed a cross appeal. Hoffmans filed no answering briefs, and were not represented on the appeal. Each of the title companies filed a separate brief, and several distinguished counsel from other jurisdictions joined in briefs amicus curiae on behalf of the American Bar Association. There are numerous assignments of error upon each cross appeal. However, the principal contention of each of the title companies also falls into classifications: (1) that their conduct in the drafting and preparation of documents affecting title to real estate, and explanation of the effect of such documents, does not constitute the practice of law in Arizona, (2) that such conduct by reason of long established customs and practice of the title companies

426

is incidental to their lawful business, and in the absence of a specific showing that it is not in the public interest, does not constitute the unauthorized practice of law. We will therefore discuss these issues under general categories.

These propositions involving similar circumstances have been advanced in many jurisdictions in our country, resulting in conflicts of opinion. Since this is a matter of first impression in this jurisdiction, and one of considerable importance to the public in general, as well as to the litigants involved, we deem it pertinent and proper to examine not only the cases but also the sources from which our regulation of the practice of law in the United States has developed, and from which present-day conceptions of the legal profession have sprung.

### The Rule of Law.

From the inception of our national form of government, we have recognized and attempted to proceed under a system which is commonly referred to as "the rule of law." "The rule of law" signifies equality in the determination of the rights, responsibilities and relationships of individuals under established law, instead of by edict or the shifting whims of dictatorial authority. To give force and effect to such established law, lawyers have been found necessary. The general public has had difficulty in understanding the role and responsibilities of lawyers when general and local conditions have greater dissatisfaction because of failures in the administration of justice. This engenders a transferance of resentment against lawyers for real or fancied inadequacies in the law. For a better understanding of the role of lawyers under the "rule of law," we briefly examine the genesis and development of the legal profession to its status in our country today.

### The Legal Profession.

Lawyers are members of the legal profession. Webster defines "profession" as:

"The occupation, if not purely commercial, mechanical, or agricultural, or the like, to which one devotes oneself; a calling in which one professes to have acquired some special knowledge used by way either of instructing or advising others or of serving them in some art; as, the profession of arms, of teaching, of chemist. *The three professions or learned professions,*

*is a name often used for the professions of theology, law and medicine."* Webster, New International Dictionary 1946 (2d Ed., 1961). (Emphasis supplied.)

Dean Roscoe Pound in referring to these three "learned professions," makes this analysis:

"Historically there are three ideas involved in a profession: organization, learning, i. e., pursuit of a learned art, *and a spirit of public service.* These are essential. A further idea, that of gaining a livelihood, is involved in all callings. It is the main if not the only purpose in the purely money making callings. *In a profession it is incidental.*

\* \* \*

"The best service of the professional man is often rendered for no equivalent or for a trifling equivalent and it is his pride to do what he does in a way worthy of his profession even if done with no expectation of reward. This spirit of public service in which the profession of law is and ought to be exercised is a prerequisite of sound administration of justice according to law. The other two elements of a profession, namely, organization and pursuit of a learned art have their justification in that they secure and maintain that spirit." Pound, *The Lawyer from Antiquity to Modern Times* 6, 10 (1953). (Emphasis supplied.)

The seeds of our legal profession are found in ancient Greece, where ethical customs, religious rites, law in general and social control as a whole were implicit in the meaning of "law." The patriarchal duties of the head of a household to interpret these "laws" to those under his protection, gradually were assumed by "interpreters" whose special learning in custom and tradition gave them the role of consultants on how to carry on litigation, how to predict a decision, or how to decide a controversy. Litigation was conducted before a tribunal consisting of large bodies of citizens in what amounted to popular assemblies, who were not bound by "the rule of law" as we know it. This gave rise to professional speech writers, who for a fee, drew up a speech for a client who delivered it before the tribunal. The Roman orator who derived from these speech writers was the forerunner of the modern advocate. In the fifth and sixth centuries B. C., advocates ceased

to be mere orators and were trained by study in law schools which had gradually evolved. A fixed number was attached to each court, the law recognized fees and fixed the scale, and professional discipline was provided for. The three functions of (1) adviser regarding wills and conveyances, formal transactions, citizens' legal rights and duties, (2) agent for litigation, i. e. those who prepared a case for trial, (3) trial lawyer or advocate, developed in Rome.

In the dark days of the middle ages, when civilization was overrun by barbarians, the Germanic law was purely local. There was no written body of decisions or laws to establish precedent or uniformity, and thus no need for a legal profession. The Christian church preserved much of the fundamental forms of Roman laws and procedure in ecclesiastical courts, until, because of conflicting claims on the part of church and monarch in England, common law courts began to emerge. While there is evidence of some ''attorneys'' appearing in court for litigants, the legal profession as we know it was not evident before the middle of the thirteenth century.

''Before the end of the thirteenth century there already exists a legal profession, a class of men who make money by representing litigants before the courts *and giving legal advice.*

\* \* \*

''\* \* \* In that year (1292) King Edward directed his Justices to provide for every county a sufficient number of attorneys and apprentices from among the best, the most lawful and the most teachable, *so that King and people will be well served.* \* \* \* By this measure, which, however, may not have been the first of its kind, 'both branches of the profession' were placed under the control of the justices, and apparently a monoply was secured for those who had been thus appointed.'' Pollock & Maitland, *The History of English Law* 211, 216 (2d Ed., 1952). (Emphasis supplied.)

In the seventeenth century:

''Attorneys therefore did the bulk of the more straight-forward conveyancing and drafting of pleadings, while the barristers acted as consulting experts. \* \* \* In the meanwhile, many students of the Inns of Court specialized in pleading and conveyancing, *and practiced as members of new sub-*

*divisions of the legal profession as 'pleaders,' 'equity drafts-men' and 'conveyancers.'"* Plucknett, *A concise History of the Common Law* 226 (5th Ed., 1956). (Emphasis supplied.)

From these beginnings, and through a system unnecessary to detail here, the English legal system produced trained lawyers whose functions were and still are frequently specialized.

The legal profession in this country had its inception in lawyers who had been trained in the common law of England. Dean Pound points out that because of Puritan hostility to English lawyers, lack of printed information as to English law, the supremacy of the clergy in the colonies, and interference by royal governors, in Colonial times there were four stages in the early development of the profession:

"(1) the attempt to get along without lawyers, (2) the stage of irresponsible fillings out of writs by court officials and pettifoggers, (3) the era of admitted practitioners in permanent judicial organizations, and (4) the era of trained lawyers—the bar on the eve of the Revolution." Pound, *The Lawyer from Antiquity to Modern Times* 135-163 (1953).

However, the formative era of the true legal profession in America is perhaps the period from the Revolution to the Civil War. Economic and political conditions after the Revolution magnified hostility toward English law. The new republic, dedicated to democratic ideals, viewed with suspicion privileges granted to any special class, and therefore, restricting to lawyers the right to practice law was considered "undemocratic." The opinion of the Indiana Supreme Court as late as 1893 typifies the general attitude which reduced the practice of law in effect to a mere private, money-making occupation:

"Whatever the objections of the Common Law of England, there is a law higher in this country, and better suited to the rights and liberties of American citizens, that law which accords to every citizen the natural right to gain livelihood by intelligence, honesty, and industry in the arts, sciences, the professions, or other vocations." *In re Leach,* 134 Ind., 663, 668, 34 N. E., 641-642 (1893).

The effects of this attitude have been noted by Pound, who states:

"The harm which this deprofessionalizing of the practice

of law did to the law, to legal procedure, to the ethics of practice and to forensic conduct has outlived the era in which it took place and still presents problems to the promoters of more effective administration of justice." Pound, *The Lawyer from Antiquity to Modern Time* 232 (1953).

During this period legislation was enacted in many states to permit any person of good moral character to practice law. Little or no organization prevailed in the profession, with the result that the

". . . profession was a complacent, self-satisfied genial fellowship of individual lawyers—unalive to the short-comings of justice, unthinking of the urgent demands of the impending future, unconscious of their potential opportunities, unaware of their collective duty and destiny." Wigmore, *The Spark That Kindled the White Flame of Progress,* 20 J. Am. Jud. Soc'y., 176 (1937).

In the last quarter of the nineteenth century there was a revival of the professional nature of the practice of law. Although acknowledging the "incidental" aspects of the necessity of gaining a livelihood through the practice of law, emphasis was increasingly placed upon the responsibilities of the legal profession in the administration of justice through a spirit of public service. Again the courts assumed the final responsibility of determining qualifications and imposing discipline upon the members of the profession for failure to live up to this spirit.

Certain conclusions emerge from the foregoing historical survey. The legal profession experienced a slow beginning and endured innumerable periods of shrinkage and expansion as a result of various economic, social and political circumstances prevalent in various stages of western civilization. From this historical trend it is inevitable to conclude that as the body of the law has grown, the community has needed and continues to require *the services of men learned in the law.* It follows that when legal tasks are performed by men who are neither professionally trained nor motivated, the best interests of the public cannot be served.

Mindful of the conclusions suggested by historical perspective, contemporary trends and events take on added significance.

Since World War I, during the era of expansion and specialization in the economic world, the functions of the lawyer also have tended to become specialized. Lawyers in a law firm or individual lawyers frequently confine their practice to various intricate branches of the law, such as corporations, trusts, taxation, real estate, etc. Such work necessarily involves close association with business and commercial transactions. Most of the mechanical aspects involved in drawing and preparing instruments in the course of such transactions is delegated to clerks and non-legal assistants, under the direction of the lawyer. The legal effect of such instruments, however, is the responsibility of the lawyer, not the amanuensis. The person for whose benefit such services are performed is entitled to know the effect of the instrument so far as his legal rights and responsibilities are concerned, and this too, is the duty of the lawyer to explain. The extremely confidential nature of the relationship between lawyer and client is deeply embedded in our law, and gives rise to the doctrine of privileged communication. The lawyer who fails to honor this confidential relationship, and the related duty of placing his client's interest above that of his own interests or those of any other person, is subject to discipline by the courts, and even to disbarment from the practice of law.

It has been acknowledged since antiquity that any person has the right to act for himself, "in propria persona," in legal matters. Nevertheless, because of the intricacies of the great body of law developed over centuries, the layman may be at a disadvantage in comprehending the legal effect of his words or conduct, unless he has the counsel of or is represented by a lawyer whose special training and professional obligations qualify him to supply such aid. A lawyer's license to practice law is based upon such qualifications, approved by the courts, and subject to their discipline when he fails to live up to the ethics of the profession. This, then is the basis for determining whether or not in a given case, the actual or purported practice of law is authorized.

*Defining the Practice of Law.*

In the light of the historical development of the lawyer's functions, it is impossible to lay down an exhaustive definition

of "the practice of law" by attempting to enumerate every conceivable act performed by lawyers in the normal course of their work. *We believe it sufficient to state that those acts, whether performed in court or in the law office, which lawyers customarily have carried on from day to day through the centuries must constitute "the practice of law." See Opinion of the Justices, 289 Mass., 607, 194 N. E., 313 (1935).* It is obvious to anyone familiar with the work of attorneys that most of the activities engaged in by appellees here under review, traditionally have been and presently are conducted in the regular course of their practice by members of the bar.

*Appellees argue that no specific fee is charged for the preparation of various legal documents and that therefore failure to charge for such services removes them from the field of the practice of law. This contention is specious, since receipt of compensation is not the feature which determines whether a given act is the practice of law.* It cannot be disputed that the attorney who, without compensation, represents an indigent under the program of legal aid obtaining in Arizona and many other jurisdictions, is practicing law to the same extent as one who receives a fee from a client able to pay for legal services. See, e. g., *Beach Abstract & Guaranty Co.* v. *Bar Ass'n of Arkansas*, 230 Ark., 494, 501, 326 S. W. (2d), 900, 903 (1959); *In re Baker*, 8 N. J., 321, 338, 85 A. 2d, 505, 514 (1951); *State, ex rel. Wright*, v. *Barlow*, 131 Neb., 294, 296-297, 268 N. W., 95, 96 (1936). Reliance by the client on advice or services rendered, rather than the fact that compensation is received, is more pertinent in determining whether certain conduct is the purported or actual practice of law.

### Relation of Lawyer to Client and Court.

As an adjunct to its power to license attorneys, the Supreme Court has the correlative power to govern the conduct of members of the bar. *In re Greer*, 52 Ariz., 385, 81 P. 2d, 96 (1938). Through the exercise of this power, the Court insures that practitioners observe the highest professional standards, and that they live by the Canons of Professional Ethics, which in Arizona, have been made applicable to members of the bar by statute and rule of Court. Rules of the Supreme Court, Rule 29(a); A. R. S. Section 32-267. *Many of the Canons of Professional Ethics which attorneys must observe most scrupu-*

*lously are diametrically opposed to the code by which business-men must live if they are to survive.* Perhaps the most important applicable Canon states that

"The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied." Excerpt from Canon 15, Canons of Professional Ethics.

The relationship between title company employees and company customers bears none of the characteristics of the attorney-client relationship envisioned in this Canon. The evidence indicates unequivocally that the primary objective of the title companies is the business of insuring titles and that, therefore, the employees' concern with the legality of transactions leading to a policy of title insurance must be primarily from the point of view of the company's rights and obligations rather than that of the parties to the transaction. *Pioneer Title Insurance & Trust Co.* v. *State Bar of Nevada,* 74 Nev., 186, 193, 326 P. 2d, 408, 411 (1958).

There is further evidence indicating that the relationship between title company employees and company customers may lack the professional posture so necessary when the customers' legal rights are involved. Title company witnesses consistently testified that when dealing with customers, they carefully avoided conversation which would involve a discussion of the customers' objectives, or legal rights and obligations with respect to the property being conveyed. *Nevertheless, the title company employee, in "filling in a form," obviously exercises his own discretion as to what form should be used, and what language is to be inserted* in the blank spaces. By virtue of his training and professional role, the lawyer is able to question his client freely, advise him of the legal effect of various forms of conveyance or other instruments, and then use such legal documents and language as will best effect the objectives of the client. *The title company employee, treading on doubtful ground, is hesitant to ask relevant questions and even more reluctant to make positive recommendations regarding the legal aspects of a prospective transaction,* although he is nevertheless willing to draft legal instruments in order that a title policy

may be issued. This kind of quasi-legal counselling was condemned by the Supreme Court of Washington when it referred to

"The representation of qualification and competence to do work of a legal nature and to advise upon that subject, which is implicit in the preparation of any legal document by the selection and completion of a blank form." *Washington State Bar Ass'n* v. *Washington Ass'n of Realtors,* 41 Wash. 2d, 697, 701, 251 P. 2d, 619, 621 (1952).

Moreover, the Supreme Court of Arkansas recently concluded:

". . . upon matters affecting one's *legal rights,* one must have assurance of competence and integrity and must enjoy freedom of full disclosure, with complete confidence in the undivided allegiance of one's counselor in the definition and assertion of the rights in question." *Beach Abstract & Guaranty Co.* v. *Bar Ass'n of Arkansas,* 230 Ark., 494, 501, 326 S. W. 2d, 900, 903 (1959). (Emphasis supplied.)

*Whether he realizes it or not, the customer usually operates without these guarantees when he deals with the title company employee.* The title companies and their non-lawyer employees are, in most cases, completely unqualified to practice law: they are usually not trained to do so; they are not normally governed by the code of ethics to which lawyers are subject; their principal motivation is the business of the title company, not of the customer. *It would be specious indeed to adopt the title companies' proposition that there must be a "specific showing" that the conduct complained of is not in the public interest, when that interest is subordinated to the companies' business interests.*

### Corporations Cannot Practice Law.

It is a well-established proposition that a corporation cannot practice law under any circumstances. *State Bar Ass'n of Connecticut* v. *Connecticut Bank & Trust Co.,* 145 Conn., 222, 234-235, 140 A. 2d, 863, 871 (1959); *Bump* v. *District Court of Polk County,* 232 Iowa, 623, 640, 5 N. W. 2d, 914, 922 (1942); *Hexter Title & Abstract Co.* v. *Grievance Committee,* 142 Tex., 506, 179 S. W. 2d, 946, 157 A. L. R., 283 (1944). The fundamental basis for the prohibition against a corporation prac-

ticing law is found in the extensive and rigid requirements which must be met to hold a license to practice law. Some of these are learning in the law resulting from intensive study, passage of a difficult examination, demonstrated good moral character and subjection to discipline by the court. None can be satisfied by a fictional entity such as a corporation, and corporate employees who have satisfied these tests are, except in rare instances, similarly barred from practicing law for corporate customers. *In re Co-operative Law Co.*, 198 N. Y., 479, 483, 92 N. E., 15, 16 (1910).

### Title Company Lawyers.

We realize that each of appellee title companies has in its employ one or more reputable, competent lawyers. We do not impugn the integrity of these attorneys, but think it advisable to clarify their position. As licensed attorneys, they are officers of the court, and subject to the same judicial control and discipline as other duly admitted practitioners. Their chief function is to furnish legal advice and services to the title company and its non-legal employees. The evidence indicates that title company customers, if represented at all, frequently are represented by company attorneys through the intermediary of the non-lawyer employees by tacit or implied consent, particularly in the selectivity necessary in preparation of instruments other than title insurance policies. If the customer's legal rights are affected by an instrument prepared by, or under the direction of a company lawyer, the customer must expect allegiance equal to that owed by the attorney to the title company. If there are adverse interests (and there usually are in a land transaction), the position of the title company attorney is particularly difficult. Under Canon 6, Canons of Professional Ethics, a lawyer is generally prohibited from representing parties with conflicting interests, although in some instances, where there is express consent and full disclosure of the facts, he may do so. The title company lawyer is confronted with at least three separate clients: the title company, and each of its customers involved in the transaction. It is difficult to conceive how the title company attorney can maintain the proper professional posture toward each, when at least some of their interests may conflict.

*The evidence further shows that in some instances, the title*

*companies, through advertising media, hold out to the public that they have lawyers on their staff, the implication being that the customers as well as the title company will have adequate legal representation in any business dealings. Under such circumstances, the title company lawyer should be aware of the limitations placed upon him and his corporate employer by reason of Canons 27, 35 and 47, which prohibit (a) a lawyer from advertising, (b) exploitation of his professional services by a lay agency, personal or corporate, as intermediary between him and a client, and (c) use of his name to make possible the unauthorized practice of law, respectively.* .See *In re Rothman,* 12 N. J., 528, 97 A. 2d, 621 (1953).

*Practice of Law in Matters Incidental to Business.*

The title companies rely heavily upon the theory that even if some of their acts complained of fall within the definition of the "practice of law," nevertheless by reason of long established custom such conduct has become incidental to their lawful business, and in the absence of specific showing that it is not in the public interest, it should not be considered "unauthorized" practice of law. The implication is that the acts complained of are of a minor nature, and that performance of them concurrent with the title insurance and trust business is a convenience to their customers.

The testimony of several witnesses indicates that these practices *are not necessary concomitants* to the title insurance business. See *Pioneer Title Insurance & Trust Co.* v. *State Bar of Nevada,* 74 Nev., 186, 194-195, 326 P. (2d), 408, 412 (1958). Title company witnesses admitted that the drafting and preparing of legal documents involved in land transactions is handled by outside counsel in certain of the less urban communities in the state. They further stated that the practices under attack were instituted in Phoenix and Tucson as long as twenty years ago, before either city was a major urban center. The clear implication from all of this evidence is that great population does not make necessary the practices of the title company defendants. It was conceded by at least one title company witness that the preparation of legal instruments is a burden without which the title companies would be happy. This burden is clearly one which should not be borne by these defendants, even if viewed merely as an "incidental" part of

their business. As the Court appropriately stated in *Hexter Title & Abstract Co.* v. *Grievance Committee*, 142 Tex., 506, 518, 179 S. W. (2d), 946, 952, 157 A. L. R., 268, 280 (1944):

"The work of preparing these papers is distinct from the searching and insuring of the title—the legitimate business for which the corporation is incorporated. It is not the business of the title insurance company to create a good title in an applicant for insurance by preparing the necessary conveyances, nor to cure defects in an existing title by securing releases or prosecuting suits to remove clouds from title, merely for the purpose of putting the title in condition to be insured."

We agree with the California court which stated in *Agran* v. *Shapiro*, 127 Cal. App. (2d), 807, 817, 273 P. (2d), 619, 625 (1954), that "Any rule which holds that a layman who prepares legal papers : . . is not practicing law when such services are incidental to another business . . . completely ignores the public welfare."

*Preparation of Instruments When Appellees Have An Interest in the Subject-Matter.*

The title companies maintain that they may prepare legal instruments in transactions in which they have an "interest" in the subject-matter. With this proposition we agree. We disagree, however, with appellees' view as to what "interest" in the subject-matter of a transaction is sufficient to permit self-representation. It has been long accepted that any person may represent himself in "propria persona" in matters wherein his rights or obligations may be sustantially affected. This principle applies to appellees and was recognized by the trial court in its conclusions of law which state:

"The term 'with an interest' . . . means a financial interest other than the right to or prospect of compensation for services rendered even though there be the possibility of liability for misfeasance, malfeasance or nonfeasance in the performance of such service for which the fee is contemplated."

The Supreme Court of Kentucky recognized this principle in the following language:

". . . one, who is not a lawyer, must not only act without consideration for his services in drawing the paper but he must be a party to, or his name must appear in, the instrument as

one to be benefitted thereby. Merely having a pecuniary interest, direct or indirect, in the transaction covered by the instrument he draws will not suffice to relieve him of the charge of unauthorized practice of law unless he is a party to, or his name appears in, the paper as one of the beneficiaries thereof.'' *Carter* v. *Trevathan*, S. C. Ky., 309 S. W. (2d), 746, 748 (1958).

We note there may be contractual pecuniary obligations between one or more of the parties, whose rights and obligations to each other are affected by the document or paper, and a third party who has performed services in negotiating the transaction (i. e., a realtor who brings buyer and seller together) which may be appended to a document. However the mere assertion of these contractural rights in the document itself, naming the third party, does not suffice to make him a ''party with an interest'' in the transaction, since his interest is not in the subject matter but in fees for his services in bringing it about.

As the trial court illustrated, a person or corporation owning an interest in real estate has an interest in property and may prepare his or its own contracts or other instruments in relation to that property provided such person or corporation is a party to such instruments; a person or corporation lending money has an interest in the transaction and may prepare those documents necessary in connection with such loan. A title company serving as trustee under a subdivision trust, has only a special interest arising primarily in connection with the fees to be received for the service to be performed. Although it may specify provisions which in its opinion must be included, deleted or modified for the protection of itself, it may not draft provisions which do not clearly affect its own rights or liabilities as fiduciary. Finally, it should be apparent that as a party to the insurance contract, the title company is entitled as escrow holder or insurer to prepare the escrow instructions and title policy. However, deeds, mortgages, releases, or other instruments affecting the obligations or rights between parties other than the title company, even though involved indirectly in a business transaction which may also include doing business with the company, if prepared by it would constitute the unauthorized practice of law.

### The Effect of Long-Standing Custom.

Appellees, or at least one of them, contend that the acts herein complained of,

"... are not the practice of law in Arizona *because* of long-standing custom and *because* experience has established that no act done by ... (appellee) ... must be performed instead by a licensed attorney in order to protect the public interest." (Emphasis supplied.)

*This is tantamount to saying "We have been driving through red lights for so many years without a serious mishap that it is now lawful to do so." The fact that these practices have continued for many years and have been acquiesced in by the bar does not make such activities any less the practice of law.* It seems fair to assume that the public is relatively unaware of the evils inherent in this situation, or at least ignorant of the fact that they are not adequately represented in the average land transaction. It is apparent that the bar has been remiss in allowing the present custom to develop unabated. It is true that the record does not disclose any testimony regarding specific injury to the public from appellees' practices. However, in the sphere which encompasses the regulation of the practice of law, it is not merely this Court's function to redress past injury but to prevent harm in the future as well. Thus, *neither the public's blissful acquiescence nor the bar's confessed lethargy can clothe the activities with validity. There is no prescriptive right to practice law and appellees have acted "at their peril" since the time when the practices condemned here were initiated. Keyes Co. v. Dade County Bar Ass'n*, S. C. Fla., 46 So. 2d, 605 (1950); *Grand Rapids Bar Ass'n* v. *Denkema*, 290 Mich., 56, 287 N. W., 377 (1939); *Rhode Island Bar Ass'n* v. *Automobile Service Ass'n.*, 55 R. I., 122, 179 Atl., 139 (1935). The various "declartions of principles" approved by the organized bar and the title companies cannot operate to deprive the Court of its duty to determine the qualifications necessary for the practice of law.

In the recent case of *State, ex rel. Reynolds*, v. *Dinger*, Wisc.       , 109 N. W. (2d), 685 (1961), the Wisconsin Supreme Court in a 4-3 decision, dismissed an action seeking to outlaw certain activities of real estate brokers throughout the state, and to invalidate the administrative rule under which those activities were pursued. The *Dinger case* is distinguish-

able from the case at bar in several important respects, one of which is the express approval by the Wisconsin legislature of the use by brokers of 60 standard real estate forms (Wisc. Rev. Stats., Section 235.16). Even in the absence of such distinctions, we cannot agree with the grounds of this decision. The majority revealed that it was somewhat perplexed by the quandary in which it found itself when it stated:

"Of course *a violation of the law does not attain legality by the lapse of time*. On the other hand the acquiescence of the bar and the courts in a practice for some one hundred years may be persuasive that at least the practice has not been unauthorized.

\* \* \*

"*When we consider that such practices should be discontinued it will be time for us to use our power*. It is not required now." Wisc. , , 109 N. W. (2d), 685, 691-692. (Emphasis supplied.)

We agree with the strong dissent, that

"What might have been overlooked in the early days of this state in the type of society which then existed should not be countenanced in a much more complex society which exists today. For example, 50 years ago—even 25 years ago, whether a husband ought to hold real estate in joint tenancy with his wife was a fairly simple question—not so today if one has any understanding of tax laws. The completion of forms by brokers may have some usefulness, but it is a dangerous usefulness today, primarily for the benefit of the brokers, not the public.

\* \* \*

"If brokers may practice law 'a little bit' there is nothing to stop them from advertising that fact and advising clients they need not hire a lawyer." Wisc. , , 109 N. W. (2d), 685, 693.

In our view, if we were to follow the rationale of the majority in this decision, we·would only be refusing to resolve the issues, and inviting still greater problems in the future.

### The Position of Real Estate Brokers.

Everything which we have heretofore stated with reference to appellee title companies applies with equal force and effect to appellee real estate brokers. It must also be noted in this connection that although the legislature may impose

additional restrictions which affect the licensing of attorneys, it cannot infringe on the ultimate power of the courts to determine who may practice law. *In re Greer*, 52 Ariz., 385, 389-390, 81 P. (2d), 96, 98 (1938).

### Conclusion.

We have enunciated the general principles of the nature of the practice of law in Arizona, and that it must be and is confined to those who have been duly licensed as lawyers, and that neither a corporation nor a layman, under the guise of long-established custom or as to matters which they may claim incidental to their lawful business, may engage in the practice of law. There is no legal requirement that a person, corporate or otherwise, direct another with whom it has business dealings to consult a lawyer, although it might be both wise and expedient to suggest this course.

We agree with the trial court's determination that there is no basis for injunctive relief or adjudication of contempt in the absence of a showing that appellees will refuse to follow the law as indicated by the court, and therefore specifically affirm that portion of the judgment and decree.

Judgment of the trial court is affirmed in part, and reversed in part, and the trial court is directed to enter the following declaratory judgment:

It is ordered, adjudged, and decreed that those acts, whether performed in court or in the law office, which lawyers customarily have carried on from day to day through the centuries constitute the practice of law. Such acts include, but are not limited to, one person assisting or advising another in the preparation of documents or writings which affect, alter or define legal rights; the direct or indirect giving of advice relative to legal rights or liabilities; the preparation for another of matters for courts, administrative agencies and other judicial or quasi-judicial bodies and officials as well as the acts of representation of another before such a body or officer. They also include rendering to another any other advice or services which are and have been customarily given and performed from day to day in the ordinary practice of members of the legal profession, either with or without compensation.

It is further ordered, adjudged, and decreed that: the defendant title companies are engaging in unauthorized practice

of law when they: (a) prepare by drafting or filling in blanks, deeds or conveyances of any kind, forms of notes, mortgages, satisfactions of mortgages, assignments of mortgages, contracts for sale of real estate, or assignments thereof; (b) prepare, by insertion or filling in of blanks, customary or other forms of subordination agreements, outright or unconditional lease termination agreements, outright or unconditional assignments of leases, rental agreements, lien waivers, affidavits or completion of improvements, partial releases of mortgages, or deeds of patented mines; (c) prepare "curative" instruments even in connection with title insurance or escrows; (d) draft, prepare or fill in blanks in applications to assign an assumption of leases of federal lands; assignments of state leases; forest permits or assignments or waivers thereof; restrictions or restrictive covenants affecting real property; (e) prepare, draft or fill in any other instruments not here enumerated affecting interests in or titles to real property, or creating or releasing burdens or encumbrances upon land; (f) draft, prepare or fill in bulk sales notices, affidavits or claims; modification, extension, water or party wall agreements; agreements of cancellation and termination other than of escrow agreements to which they are parties as escrow agents; administrators' or executors' deeds; amendments of restrictions; options; corporate resolutions; affidavits of termination of joint tenancy; instruments of deeds of dedication or creating easements or rights of way; consents to assignments; subdivision plats; wills; or any document or pleading designed or intended for presentation or submission to a court, board or commission, or a judicial or quasi-judicial body or official; (g) draft trust agreements, subdivision or otherwise; (h) prepare documents relating to personal property, even when they intend to insure the title to such property; (i) give advice concerning or explain the legal effect of transactions involving or affecting interests in or title to real property, or creating or releasing burdens or encumbrances upon land, including but not limited to subdivision trusts; (j) give advice concerning, or discuss the legal effects of clauses in wills or other legal instruments; (k) give advice concerning or discuss the legal effects or implications of tax legislation.

It is further ordered, adjudged and decreed that: the defendant title companies may engage in the following activities, which do not constitute the practice of law: (a) draft and suggest the inclusion of clauses in any document affecting its fiduciary capacity, for its own protection as such fiduciary, when acting as a trustee, administrator, executor, subdivision trustee or other fiduciary; (b) prepare or draft any instrument relating to property in which the title company has an absolute or equitable ownership, or proposes to acquire such ownership thereby; (c) formulate and prepare policies of title insurance, and state the conditions or requirements to be met before it will issue a particular title insurance policy, and state its reasons for refusal to issue any particular title insurance policy; (d) furnish abstracts of title and similar information reports, without expressing opinions as to the validity or legal effect of documents or information contained or referred to therein; (e) transmit notices requiring strict performances and notices of forfeiture required to be served by it as a condition of delivery of any documents it holds in a collection escrow; (f) deliver to or file with any person or public body or officer, any document which it is specifically required to file or deliver under the terms of any instrument which designates it in a fiduciary capacity.

It is further ordered, adjudged and decreed that real estate brokers, agents and salesmen are governed by the same limitations applicable in the course of their lawful business, above enumerated and described as applying to the title company defendants.

It is further ordered, adjudged and decreed that real estate brokers, agents, and salesmen may prepare or draft any instrument relating to property in which such broker, agent or salesman has an absolute or equitable ownership, or proposes to acquire such ownership thereby; and may draft or prepare memoranda for the receipt of money but may not, as agents, draft or prepare any instruments purporting to create legal rights or impose legal responsibilities as between third parties.

STRUCKMEYER, JR., Chief Justice, BERNSTEIN, Vice Chief Justice, UDALL, Justice and JONES, Superior Court Judge, concur.