[Nos. C. D. 2790, 2881.  *En Banc.*  March 28, 1962.]

*In the Matter of the Disciplinary Proceedings Against*
HERBERT J. DROKER and EUGENE J. MULHOLLAND,
*Attorneys at Law.**

* Reported in 370 P. (2d) 242.

*T. M. Royce*, for Board of Governors.

*Robbins, Oseran & Robbins*, for respondents.

ROSELLINI, J.—The respondents have been partners in the practice of law since 1950, occupying space in the place of business of the Washington Escrow Company, a Washington corporation. Together they own a majority of the shares of stock. Both have been members of the board of directors since 1946. Mr. Mulholland is and has been president of the company; Mr. Droker is and has been executive vice-president; and the company's affairs have been under their active management, control, and direction. None of the other directors or stockholders has participated in the active management or direction of the affairs of the company.

Since 1950, the Washington Escrow Company has had its main office and principal place of business in Suite 624 Securities Building, in downtown Seattle. The offices of the law partnership are located in this suite, and Mr. Mulholland and Mr. Droker have had no other office or place of business.

The primary business of the Washington Escrow Company is to hold in escrow the documents and money involved in the sale or exchange of real estate, businesses, leases, and personal property. Such business is generally referred or brought in by real-estate or business-chance brokers, and in the handling of escrows the Washington Escrow Company endeavors to satisfy the interests of the

brokers, the buyers, and the sellers. In general such business involves the receiving, holding, preparing, or completing of all documents incident to the completion of such sales or trades and the transfer of title, the supervision of their execution and their ultimate delivery, and the receipt, holding, and disbursement of the purchase price.

Ordinary sales of residences are handled by employees of the company, not attorneys, who process the documents involved. Two "lines" of employees who perform this function, are divided into sections. The receiving section receives the earnest-money agreement and records pertinent data therefrom. The "sign-up" or "interviewing" section checks the accuracy of the description of the real estate. The employees in this section also make a preliminary check with a title insurance company as to the apparent ownership of the property and order the title insurance. They prepare escrow instructions, and select and prepare or complete all documents that must be executed and delivered in order to complete the sale or trade.

The employees in this section interview the buyer and seller, review with them the documents necessary to complete the transaction and give whatever explanation is required to secure the execution of the documents. They determine the defects of title as shown by the title insurance report and initiate steps to clear up such defects.

In the "closing" section, employees receive the money that is deposited with the company by the buyer; make out a financial statement, called the "closing statement," showing the segregation of the money received and the disbursement made; initiate action to record or file all documents that must be placed of record, and deliver to the persons entitled thereto all of the documents and funds involved in closing the transaction.

In the "final review" section, the employees receive the closed files from the "closing" section, check fire insurance policies to make sure they are properly endorsed for transfer, and pay the title insurance and other expenses directed by the escrow instructions.

The "sign-up" section is operated by two persons, an

interviewer and a typist. The typist sometimes fills in, completes, or otherwise prepares all of the documents involved, without instruction or direction from anyone. In other instances, the typist prepares such documents after receiving instructions from, or consulting with, the interviewer; and in some instances the interviewer consults with Mr. Droker or Mr. Mulholland before giving instructions to, or consulting with, the typist.

In some instances, the earnest-money receipts submitted to the company contain mistakes, ambiguities, or inaccuracies, or are deficient in other respects; and in some instances a question is created as to the binding nature of the contract. The employees in the "sign-up" section write or word the escrow instructions in a form designed to cure the mistake, inaccuracy, deficiency, or ambiguity.

The escrow instructions are drafted on forms, containing blanks, printed by the company. These printed forms are used in all cases. They contain provisions similar to those in the earnest-money receipts, but almost never in the same language. The result is that the contract made by the earnest-money receipt is changed by the superseding escrow instructions.

Many types of legal instruments are prepared by the clerks in the "sign-up" section. They include deeds, promissory notes, real-estate and chattel mortgages, real-estate contracts, affidavits, assignments of real-estate contracts, assignments and releases of real-estate mortgages, conditional-sale contracts for the sale of personal property, releases of chattel mortgages, and satisfactions of conditional-sale contracts.

Sales or trades of income-producing real estate and going businesses are not handled in the production lines, but are handled by Mr. Droker personally with the aid of a secretary. In such transactions, Mr. Droker meets the buyer and seller, discusses with them the terms of their agreement, prepares the necessary documents, explains their legal effect, and obtains their execution.

Since its incorporation, the Washington Escrow Company has solicited business. Mr. Mulholland makes personal calls

on real-estate brokers, and asks that the brokers include in the earnest-money receipts prepared by them the requirement that the sale or trade be closed in escrow by the Washington Escrow Company. The company supplies the brokers with free printed forms of earnest-money receipts containing this requirement, and with the name of the broker printed in large type at the top. These are furnished in sets of five copies; one is marked for delivery to the Washington Escrow Company office.

Mr. Mulholland and a Mr. Bethards (who also solicits business from real-estate brokers) urge upon the brokers the advantages of using the services of the Washington Escrow Company. Among other things, they tell the brokers that the drafting by the Washington Escrow Company will catch and correct errors and omissions, will clarify ambiguities or inconsistencies, and supply legal descriptions where necessary.

Mr. Mulholland and Mr. Bethards supply the brokers with a set of instructions concerning the language to be used in filling in the blanks of earnest-money receipts, which are printed on cards, with the name, address, and telephone number of the company. These instructions are printed in the handbook of the Seattle Real Estate Board, which has 200 to 300 members in Seattle, with the statement that they are supplied by the Washington Escrow Company. The company advertises in the yellow section of the telephone book.

Since about the year 1950, the company has made a practice of making payments to some brokers and employees of brokers to induce them to see that the escrow is sent to the company.

The bookkeeper who drew the checks for these payments was not told their purpose. Mr. Mulholland told him to charge the checks to advertising. They were so shown on the income tax returns. Some checks were made payable to cash. No buyer nor seller was ever told that a part of the money he paid for escrow fees was paid secretly to his agent, the real-estate broker.

When the buyer and seller report to the offices of the

company to sign the necessary documents, they are shown copies of the escrow instructions by employees, who explain the meaning and effect of the language used. By this means there is displayed, under the heading of amounts to be paid, the following: "To Mulholland & Droker, attorneys, drafting fee $. . . . . . . . . . . . ." (with amount filled in).

Up to 1955, the amount filled in for the buyer and the seller was the same, customarily one dollar. Since 1955, the amount filled in has been customarily $2.50 for the seller, and none for the buyer. In those cases where the drafting is considered to be so unusual as to permit a higher charge (not over five per cent of a total transaction), a larger sum has been inserted, but never more than $15. When the employees are asked what this fee represents, they say that it is the legal fee of the Washington Escrow Company. The reason such a small fee is charged is that it is considered necessary in order to meet the competition of other escrow companies, some of which do not charge anything.

Coincident with displaying the escrow instructions, the interviewer or the typist asks the buyer and the seller whether they have brought with them the documents required to close the transaction. If the answer is no, the employee asks them if they have their own lawyer who will draft the documents. If the answer is again no, the employee tells them that Mr. Mulholland and Mr. Droker have already drafted the documents needed and that they are in the file ready to be signed. Then the documents which the employees have prepared are produced. Mr. Droker follows the same procedure in the transactions that he handles.

A few years ago, the company operated branch offices in Bellevue, Renton, Northgate, and Burien. Each was open for several months, except the Burien office, which was open for three years, and closed in 1958. The operation in the branch offices was the same as in the downtown office, except that in the branch offices the clerks did all of the work. In October 1957, Mr. Mulholland and Mr. Droker formed a partnership with attorney Malcolm J. Bell, whose offices were near the Burien branch office. His duties under

this partnership agreement were solely to check the documents drafted by the employees of the Burien office. At no time did he meet or consult with the buyer or seller. He was paid by check of Mulholland and Droker one half of the fees charged. He canceled the arrangement in September 1958.

Mr. Mulholland and Mr. Droker checked the documents drafted in the branch offices, but did not meet the buyers or sellers.

The drafting fees collected by the company in the production lines are put in the company's trust bank account, and once a month a check is issued to Mulholland and Droker for the accumulated fees. This sum is divided equally between the partners, each of whom receives a monthly retainer and a salary.

In addition, they receive what they call "legal fees." These come from the transactions Mr. Droker handles: the income-producing real estate and the business-chance sales, leases, and exchanges. The escrow fee collected by him for the company is much larger than the "drafting fee." Unknown to the buyer or the seller, he diverts to "legal fees" a part of the escrow fees. The diversion, or allotment, is accomplished by direction to the bookkeeper to assign a smaller amount than was collected as escrow fees and a larger amount for "legal fees."

In one instance, for example, the drafting fee collected was $20, and the escrow fee, $285. As allotted by Mr. Droker, the escrow fee was $190, and the legal fee, $125. These legal fees have been divided equally. Mr. Droker's explanation of this procedure is that the public is educated to paying higher escrow fees, but would object to paying a larger attorney's fee and smaller escrow fee.

Mr. Mulholland and Mr. Droker regarded themselves as attorneys for the escrow company, the broker, the buyer, and the seller. The information that they were attorneys for the escrow company and the broker, was not divulged to the buyer and seller, however.

A complaint concerning the operations of the Washington Escrow Company was received by the Seattle Bar Associa-

tion in 1950. On request, Mr. Mulholland and Mr. Droker met with the Unauthorized Practice of Law Committee. They told the committee that the company did no drafting of legal documents, but referred the buyer and the seller to the law firm of Mulholland, Droker, and Pickel, who prepared the needed documents. While the chairman concluded that there was nothing wrong with the operation, as testified to by Messrs. Mulholland and Droker, he made a memorandum that the file should remain open until it could be seen whether some pattern developed that would show their story was not accurate.

That committee was not concerned with the question of whether the firm was improperly soliciting business, as that question was not within its jurisdiction.

In the May 1951 issue of the Washington State Bar News, which is mailed to all members of the association, there appeared an opinion of the committee on legal ethics under the caption "ESCROW COMPANY." After setting forth the procedure that the Washington Escrow Company followed in its "sign-up" section, the opinion stated:

·"The committee is firmly of the opinion that such a procedure would constitute unlawful practice of law by the escrow company and unprofessional conduct in violation of the canons of professional ethics on the part of the lawyer."

In 1954, Mr. Mulholland and Mr. Droker again met with the Unauthorized Practice of Law Committee at its request. After that hearing, the committee reported to the board that in its opinion, the Washington Escrow Company was engaged in the unauthorized practice of the law. The committee expressed no opinion with respect to the violation of the canons of ethics by the lawyers.

On March 11 and 25, and on April 14, 1955, Mr. Droker, Mr. Mulholland, their counsel, and representatives of other escrow companies, met with a sub-committee of the Unauthorized Practice of Law Committee of the bar association. A report was prepared for submission to the full committee, and was read aloud before representatives of the escrow companies. It expressed the opinion that they were engaged in the unauthorized practice of law.

In January 1958, disciplinary proceedings were initiated against the respondents. Several meetings were held at the offices of the Washington Escrow Company to develop the facts of the company's operations and the respondents' connection with that company. After these meetings, Mr. Droker wrote to Mr. Fred Palmer, president of the bar association, asking that he not sign the formal complaint, and stating that he and his partner would probably be willing to accept an opinion of the association's officers as to what was considered improper in their association with the Washington Escrow Company, and to make arrangements to sever any such association.

The complaint was signed, however, and a thorough investigation followed that disclosed incriminating facts concerning the operation, which the respondents had not previously revealed. On the findings of fact, set forth in substance above, the trial committee made conclusions, which were concurred in by the Board of Governors and in substance were as follows:

1. Mr. Mulholland and Mr. Droker aided the Washington Escrow Company in the unauthorized practice of law, violating Canon 47 of Professional Ethics.[1] The company practiced law (a) by drafting escrow instructions to cure mistakes, ambiguities, inaccuracies, and deficiencies in the earnest-money receipts; (b) by selecting from the many forms available the form it deemed appropriate to complete the transaction according to the earnest-money receipt and the title-insurance report; (c) by making decision as to the language appropriate to express the intent of the earnest-money receipt; (d) by preparing special clauses for insertion in legal blanks to satisfy special situations; (e) by explaining to the buyer and seller the meaning and effect of the documents drafted; (f) by making decision as to defects in the title as shown by the title report and initiating steps to cure the defect.

---

[1] "No lawyer shall permit his professional services, or his name to be used in aid of, or to make possible, the unauthorized practice of law by any lay agency, personal or corporate." RCW Vol. 0.

2. Mr. Mulholland and Mr. Droker allowed their services to be exploited by a lay agency when, by arrangement with the company, they accepted small fees for legal work and the company received substantial fees for its escrow work, violating Canon 35.[2]

3. They solicited professional employment, in violation of Canon 27,[3] through the Washington Escrow Company, and the company has been used by them as a runner for pay and reward to procure others to seek their services, violating Canon 28.[4]

4. They have divided their fees in violation of Canon 34[5] by failing to segregate completely the practice of law from the escrow business, and charging small legal fees and larger escrow fees.

5. They have received compensation and advantages from the company, without disclosure to the other clients they purport to represent, the buyer, seller, and others, as the case may be, violating Canon 38.[6]

---

[2] "The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigents are not deemed such intermediaries. . . ."

[3] "It is unprofessional to solicit professional employment by circulars, advertisements, through touters or by personal communications or interviews not warranted by personal relations. . . ." RCW Vol. 0.

[4] "It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable . . . to remunerate . . . others who may succeed, under the guise of giving disinterested friendly advice, in influencing . . . the ignorant or others, to seek his professional services. A duty to the public and to the profession devolves upon every member of the bar having knowledge of such practices upon the part of any practitioner immediately to inform thereof, to the end that the offender may be disbarred." RCW Vol. 0.

[5] "No division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility."

[6] "A lawyer should accept no compensation, commissions, rebates or other advantages from others without the knowledge and consent of his client after full disclosure."

6. They have violated Canon 12[7] by charging small fees without taking into consideration proper elements, standardizing and undervaluing their services for the admitted purpose of increasing the value of business of the Washington Escrow Company.

7. By participating, in connection with charging small legal fees, in salaries, retainers, and other benefits from the escrow company, they have increased their personal benefits without reference to the standard that the legal profession is a branch of the administration of justice and not a mere money-getting trade, violating Canon 12.[8]

8. They represented conflicting interests without disclosing to all clients the circumstances of their relations to the other parties. They did this by representing the Washington Escrow Company, some brokers, the seller for drafting, and the buyer when he was charged for drafting. This violated Canon 6.[9]

---

[7] "In fixing fees, lawyers should avoid charges which overestimate their advice and services, as well as those which undervalue them. . . .

"In determining the amount of the fee, it is proper to consider: (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client. No one of these considerations in itself is controlling. They are mere guides in ascertaining the real value of the service.

"In determining the customary charges of the bar for similar services, it is proper for a lawyer to consider a schedule of minimum fees adopted by a bar association, but no lawyer should permit himself to be controlled thereby or to follow it as his sole guide in determining the amount of his fee.

"In fixing fees it should never be forgotten that the profession is a branch of the administration of justice and not a mere money-getting trade."

[8] See footnote 7, *supra*.

[9] "It is the duty of a lawyer at the time of retainer to disclose to the

9. They made no attempt, except as to the transactions handled by Mr. Droker, to find out the cause or position of the customers of the Washington Escrow Company whom they charged for drafting. In this they violated Canon 8.[10]

10. They acted below standards of the profession in delegating to lay personnel the responsibility of interviewing the client and selecting, preparing, and supervising the execution of documents, where the lawyers did not meet the clients, violating Canon 6. (See footnote 9, *supra.*)

The final conclusion was that the course of dealings in the meetings in 1950, 1954, and 1955, with the Unauthorized Practice of Law Committee did not constitute an affirmative defense to this proceeding.

The respondents do not question the facts found by the trial committee nor challenge its conclusions. But they argue that the punishment recommended is harsh and oppressive, inasmuch as they acted in good faith and could not know that they were violating the canons until the bar association advised them what they were doing wrong, and inasmuch as they were always ready and willing to correct any practices that they might be advised were unethical. This contention is made in spite of the fact that they are presumed to know the canons; that an opinion affecting their escrow company was published in the bar news in 1951, shortly

---

client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

"It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

"The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

[10]"A lawyer should endeavor to obtain full knowledge of his client's cause before advising thereon, and he is bound to give a candid opinion of the merits and probable result of pending or contemplated litigation. . . . " RCW Vol. 0.

after they had been called before the Unauthorized Practice of Law Committee, and that a report which expressed the opinion that they were engaged in the unauthorized practice of law was read aloud before representatives of their company in 1955.

The respondents do not explain how they could not be expected to know that the escrow company was practicing law when its employees drafted escrow instructions so as to cure mistakes, ambiguities, inaccuracies, and deficiencies in the earnest-money receipts, when they selected the forms they deemed appropriate for various transactions, decided upon the appropriate language to express the intent of the earnest-money receipt, prepared special clauses for insertion in blank spaces to satisfy special situations, and explained to buyers and sellers the meaning and effect of the documents they drafted. The respondents urge that the law is unsettled in the field of unauthorized practice, citing the opinion in *Washington State Bar Ass'n v. Washington Ass'n of Realtors*, 41 Wn. (2d) 697, 251 P. (2d) 619.

It is true in that case we recognized that it is not always easy to determine whether a given act invades the province of the lawyer, but we did make it clear that the preparation of a legal form is doing work of a legal nature, and if done by a corporation or layman, may be enjoined.

It is now a generally acknowledged concept that the term "practice of law" includes not only the doing or performing of services in a court of justice, in any matter depending therein, throughout its various stages, and in conformity with the adopted rules of procedure, but in a larger sense includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured. *State ex rel. Laughlin v. Washington State Bar Ass'n*, 26 Wn. (2d) 914, 176 P. (2d) 301; *Smallberg v. State Bar of California*, 212 Cal. 113, 297 Pac. 916; *Eley v. Miller*, 7 Ind. App. 529, 34 N. E. 836.

If a layman cannot be heard to say that he is ignorant of the law, how much less may an attorney be permitted to offer such an excuse in mitigation of his offense.

While not specifically challenging the conclusion of

the trial committee and Board of Governors that the respondents had violated Canon 27 when they solicited business from real-estate brokers for the escrow company, they contend that this was not a solicitation of legal work. This position is insupportable. The escrows deposited with the company invariably required legal work; in certain cases, this work was done by the employees and in others by the respondents; and a legal fee was always charged.

A similar defense was urged in *In re Rothman*, 12 N. J. 528, 97 A. (2d) 621, 39 A. L. R. (2d) 1032, in which an attorney had intermingled his law practice with a mortgage company. The court said:

"In defense it is urged that the advertising was designed solely to promote the business of the mortgage company and not to produce law business. It is the nature of a mortgage business that it inevitably produces law business on each mortgage transaction. . . ."

In arguing that the punishment recommended by the board is too harsh, the respondents point out that in the *Rothman* case a reprimand only was administered.

In the case before us, the trial committee considered the respondents' acts so serious that it recommended disbarment. The board considered that proposal too severe and recommended a suspension of one year. In view of the number of canons violated, we do not think the discipline unduly harsh.

The respondents urge that it is unjust to single them out for discipline when many others are engaged in the same practices. We do not assume that the respondents have been "singled out." Rather we must assume that the bar association has instituted, or will institute, proceedings against all others whose violations are brought to its attention.

It is urged in mitigation that the respondents have conducted their business efficiently and that no customer has ever complained. We find in the canons no provisos which make them inapplicable to those whose violations of them result in more efficient law practice. Assembly lines, of course, are more efficient where quantity is the sole criteria. But the lawyer's service is a personal service, and

speed and volume are not its most desirable ends. It may well be true that, as the respondents say, none of their customers have complained of the service they received, and that they are respected and admired by many of their fellow attorneys. But it is apparently also true that others among their fellow attorneys have not looked with approval on their flaunting of the canons of ethics, however useful may be the service which they perform.

A similar argument was made in *State Bar of Arizona v. Arizona Land Title & Trust Co.*, 90 Ariz. 76, 366 P. (2d) 1, wherein one of the defendants argued that the acts of the title company were not the practice of law because of long-standing custom, and because experience had shown that the services of a licensed attorney were not needed in order to protect the public interest. The court said of this contention:

"This is tantamount to saying 'We have been driving through red lights for so many years without a serious mishap that it is now lawful to do so.' The fact that these practices have continued for many years and have been acquiesced in by the bar does not make such activities any less the practice of law. It seems fair to assume that the public is relatively unaware of the evils inherent in this situation, or at least ignorant of the fact that they are not adequately represented in the average land transaction. It is apparent that the bar has been remiss in allowing the present custom to develop unabated. It is true that the record does not disclose any testimony regarding specific injury to the public from appellees' practices. However, in the sphere which encompasses the regulation of the practice of law, it is not merely this Court's function to redress past injury but to prevent harm in the future as well. Thus, neither the public blissful acquiescence nor the bar's confessed lethargy can clothe the activities with validity. There is no prescriptive right to practice law and appellees have acted 'at their peril' since the time when the practices condemned here were initiated. . . ."

It is our conclusion that the recommendation of the board was justified under the facts of this case.

The respondents should be, and they hereby are, sus-

pended from the practice of law for a period of one year, commencing thirty days after the filing of this order.

FINLEY, C. J., HILL, DONWORTH, WEAVER, OTT, FOSTER, and HUNTER, JJ., concur.

