D. Jean POPE, Plaintiff–Appellant,

and

Quali–Built, Inc., Plaintiff,

v.

SAVINGS BANK OF PUGET SOUND, Defendant–Appellee,

and

Ticor Title Insurance Co. and Bruce H. Hurst, Defendants.

No. 86–3606.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1988.

Decided July 1, 1988.

Terence K. McGee, McGee & Reno, Seattle, Wash., for plaintiff-appellant.

James A. Oliver, Short & Cressman, and Christopher J. Soelling, Seattle, Wash., for defendant-appellee.

Before KOELSCH, ALARCON and POOLE, Circuit Judges.

KOELSCH, Circuit Judge:

This diversity action arises out of a three-party financing arrangement in a real estate development in Redmond, Washington known as "Deerpark." The plaintiff-seller, D. Jean Pope, claims to have lost her security interest in the property and seeks here to lay blame on the defendant, Sav-

ings Bank of Puget Sound ("Bank"), the construction lender and also escrow agent for the purchase and sale closing. The case deals with the financial intricacies of the business of developing land into a residential subdivision and particularly with the extent and limit of the escrow agent's duties. We affirm in all respects.

Pope urges numerous assignments of error but we deem it advisable to consider at the outset and on our own motion the scope of her appeal.

## I SCOPE OF THE NOTICE OF APPEAL

Judgment was entered against Pope not only on her own suit but also on the Bank's claim for attorney fees. In her notice, she merely stated that appeal was taken from "that part of the final Judgment entered in this action ... awarding defendant Savings Bank of Puget Sound $101,231.25 in attorneys' fees and costs...." Later in the month she moved the district court ostensibly under Fed.R.App.P. 4(a)(5)[1] to amend the notice, claiming that her intention had been to appeal from the entire judgment and not merely its award of attorneys' fees.

The district court, although expressing doubt over its power to do so, nevertheless granted the motion and allowed Pope to file a comprehensive notice of appeal "from the judgment." The district court's order raises two questions: did the district court possess power to allow such an amendment and, if not, can this court nevertheless consider the matter as an appeal from the entire judgment. We are clear that the district court did exceed its authority but find the error harmless: we can and do exercise our jurisdiction over the entire judgment.

Filing of the first notice of appeal divested the district court of further jurisdiction over the case. *Morgan v. Kopecky Charter Bus Co.*, 760 F.2d 919, 920 (9th Cir. 1985). However, this court possesses the inherent power to allow a party to amend a notice of appeal even without a formal motion. As we said in *United States v. One 1977 Mercedes Benz*, 708 F.2d 444 (9th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984), "we have held that a mistake in designating the judgment appealed from should not bar appeal as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced by the mistake." *Id.* at 451. *See Lynn v. Sheet Metal Workers' Int'l. Ass'n*, 804 F.2d 1472, 1481 & n. 9 (9th Cir.1986), *cert. granted*, — U.S. —, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) (noting that this Circuit, unlike others, construes Rule 3(c) liberally).[2]

In this case, it is manifest that Pope's appeal from "that part of the judgment awarding Savings Bank of Puget Sound" its attorney's fees and costs put the defendants on notice that Pope intended to appeal the underlying judgment. The award of attorneys' fees was based upon a contract provision appearing in an escrow agreement from which the Bank's liability, if any, arose. Moreover, the suit below concerned various defendants. Thus, we think it is fair to read the limitation "and that part of the judgment" to refer to the portion of the case concerning the Bank. *See Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252, 1253 (3d Cir.1977) (per curiam) (appeal from a judgment evidences intent to appeal from orders which were in the procedural progression leading to the final judgment).

The Bank suffers no prejudice by our construction of the notice of appeal.[3] Ac-

---

1. Federal Rules of Appellate Procedure 4(a)(5) provides in pertinent part: "The district court, upon a showing of excusable neglect or good cause, may extend the time for filing a notice of appeal upon motion filed not later than 30 days after the expiration of the time prescribed by this Rule 4(a)." Fed.R.App.P. 4(a)(5). We do not think a party who has already filed a notice of appeal within the period prescribed by Rule 4(a)(1) can avail herself of Rule 4(a)(5).

2. Federal Rule of Appellate Procedure 3(c) provides in pertinent part: "The notice of appeal shall ... designate the judgment, order or part thereof appealed from...." Fed.R.App.P. 3(c).

3. The Bank did not move to limit Pope's appeal nor register any objection. To the contrary, in its brief in answer to that of Pope, wherein the full sweep of her assignments were set out, the Bank stated that it "agrees with Pope's position

cordingly, we rule that in these circumstances, we should and will entertain all assignments of error made by Pope in her appellate briefs.

## II FACTS

Many of the facts in this litigation are not in dispute, but the dispositive facts are easily obscured and confused because of the dual role of the Bank as construction lender and, at various times, as escrow agent. Once the relationships between the parties with respect to the several transactions engaged in are carefully delineated and kept in mind, solutions to the seemingly difficult problems become readily apparent.

Thus it appears that in 1976 John Mercier, an experienced real estate broker and developer, contracted to purchase a five-acre tract in Redmond, Washington with the intention to develop it into a residential subdivision. The plaintiff, D. Jean Pope, his long-time friend and associate and likewise a professional dealer in real estate, had loaned him the down payment. Whether by agreement or by Mercier's good fortune, Pope was also making all the payments on the contract as they fell due. Unable to shoulder the finances, Mercier deeded the property to Pope on the condition that when and if he obtained such backing, she would reconvey the land for the fair market value plus any payments

still due and owing her. Shortly thereafter, Mercier's search met with success: he secured the commitment of the Bank to loan him 2.7 million dollars.

Thereupon, Mercier arranged with Pope the reconveyance of the five-acre tract for the fair price of $300,000, $26,000 earnest money and the balance by a promissory note secured by a deed of trust. Pope's lien, by her consent and on the Bank's insistence (as lender), was to be subordinate to the Bank's. And so she agreed with Mercier to release her interest in the first sixty-four units sold before receipt of any payment on the note from Mercier. Save for the promissory note, Mercier's attorney prepared all the necessary documents for her approval and signature, including an unlimited subordination agreement [4] and sixty-four blank request for partial reconveyance forms.[5]

After the Pioneer Title Insurance Co. ("Ticor") issued its preliminary title report, the closing wheels were set in motion. Here, for the first time, the Bank wore "two hats"[6]: those of construction lender and of escrow agent. Upon receiving the warranty deed running from Pope to Mercier, the deed of trust naming Pope the beneficiary and Ticor the trustee, the subordination agreement, the earnest money agreement and the promissory note,[7] the Bank prepared escrow instructions which Pope signed but later claimed she did not read.

---

on jurisdiction, appealability and the timeliness of her appeal."

**4.** The subordination agreement was unlimited and contained an "advance clause": "In consideration of benefits to 'subordinator' from 'owner', receipt and sufficiency of which is hereby acknowledged, and to induce 'lender' to advance funds under its mortgage and all agreements in connection therewith, the 'subordinator' does hereby unconditionally subordinate the lien of his mortgage identified in paragraph one above to the lien of 'lender's' mortgage, identified in paragraph two above, and all advances or charges made or accruing thereunder, including any extension or renewal thereof."

**5.** Request for reconveyance forms are used by the beneficiary on a deed of trust to request the trustee to reconvey her equitable interest. Typically, the developer of a condominium project presents these forms to the beneficiary of the

deed of trust for approval and signature. Without them, the developer would be unable to sell the units as they become due. *See* M. Madison & J. Dwyer, *Law of Real Estate Financing* § 4.03[2][c] and § 10.02[2][c] (1981) [hereinafter Madison].

**6.** A commercial lender's escrow department often closes the purchase and sale and/or loan transaction. *See Washington Real Property Deskbook* § 39.1 (2nd ed. 1986).

**7.** Pope claims to have sent the earnest money agreement and the promissory note to the Bank as attachments to a letter confirming Pope's agreement to extend the due date on the promissory note and to accept that she would not receive payment until after the sale of the 64th unit. The Bank denies receipt of the promissory note. Because, however, this appeal is from a directed verdict against her, we construe the facts favorable to the appellant.

The instructions were on a simple printed form; the typed inserts consisted entirely of two provisions: a notation that Pope had agreed to release her interest in the first sixty-four units prior to receiving any payment on the note and the authorization for and direction to the escrow agent to record the deeds and the subordination agreement.[8]

On the very next day following satisfaction of the only condition of the "escrow"[9], the issuance of the title report, the Bank recorded both deeds of trust, the subordination agreement, and the warranty deed.

As so often happens in construction projects, cost overruns, in this case due in part to an Act of God, led the developer to seek additional advances from the Bank. In February and December of 1979, the Bank made two additional loans to Mercier for $450,000 and $60,000, respectively. After the $450,000 loan was made, another promissory note, deed of trust, and subordination agreement were drawn up.[10] Only a promissory note was executed after the making of the $60,000 advance.

Pope claims that she and her wholly owned corporation, Quali–Built, also advanced additional funds to Mercier to help him meet the cost overruns. In consideration of these additional monies, Mercier deeded Deerpark to Quali–Built. Mercier thereafter was authorized to act on behalf of Quali–Built in all Deerpark transactions. Pope and Mercier also agreed on the eighth of October that he would deed the adjoining seven acres to Pope directly as "additional collateral" if Mercier was still unable to pay off the $274,000 debt owing her by January 1980. Mercier was ultimately unable to tender payment on that date and thus deeded the seven acres pursuant to the October 8 agreement.

Construction was completed and units began selling on October 10, 1979. Donning once again its two hats, the Bank served as escrow agent in sixty-three of the seventy-nine condominium closings.[11]

Relying on a mailgram bearing Pope's name and wired from Anchorage, Alaska where she resided, the Bank represented to Ticor, the trustee on Pope's deed of trust, that it had authorization to release in full Pope's interest in the Deerpark condominiums. Consequently, Pope's interest was released in all seventy-nine units sold.

The Bank disbursed the proceeds in accordance with instruction given it by Mercier. For our purposes now, suffice it to say that when all was said and done, the Bank was fully repaid and Pope, so she claims, came up virtually "empty-handed."

Because Mercier had died and Pope's security interest had been released, she claims damages in the amount of $260,-745.58.[12]

---

**8.** Typed in the Terms of Sale Section of the Escrow Instructions appears this language: "Seller authorizes Puget Sound Mutual Savings Bank to record.... Seller agrees to release security interest in first sixty-four units of proposed condominium prior to receiving funds to pay Note securing abovementioned Deed of Trust."

**9.** It does not appear a true "escrow" really existed; the designation of a closing transaction as an escrow is not dispositive. An escrow, in its truest sense, is a conditional delivery, and usually, but admittedly not necessarily, entails the deposit of funds in escrow and their subsequent disbursement. *Washington Real Property Deskbook, supra* n. 6, at § 39.1–.2. Here, no funds were deposited in escrow. In Mercier's instructions, he did authorize the escrow agent to use his loan proceeds to pay closing and other costs but the funds remained in control of the commercial lender at all times. Note the use of the conjunctive language of Mercier's instructions: "the seller deposits with the bank (as escrow agent) the sum of $0. The Bank is authorized to use these escrow funds *and* the loan proceeds to...." (emphasis added).

**10.** Though not part of the record, a likely explanation for why a second subordination agreement was drawn up when, under the Bank's view, the first subordination agreement's advance clause covered future loans such as this one, is that a separate, new loan origination file was opened because this second loan had loan participants.

**11.** Ticor served as escrow agent in two of the sixteen other closings. The record is silent as to the identity of the agent for or the details of the remaining fourteen closings.

**12.** This figure represents the total amount Pope calculated she would have received in principal and interest had her loan been repaid prior to the Bank's third loan of $60,000 less the sum of

Pope advanced three theories at trial; however, only two need be noticed on appeal. First, she asserted a claim in tort against the Bank, contending that the Bank breached a fiduciary duty owing as her escrow agent; and second, she asserted a claim in contract for the alleged wrongful disbursement of sale proceeds in the individual condominium closings. The court directed the verdict for the Bank on the tort claims and, after excusing the jury and hearing four more days of testimony, found in favor of the Bank on the contract claim. In addition to these determinations, Pope also assigns error to numerous procedural and pretrial rulings made by the district court. We consider each argument in turn, providing additional facts where necessary.

## III BREACH OF FIDUCIARY DUTY

■ Under Washington law applicable to this case, the fiduciary duties owing a principal by an escrow agent are defined by the escrow instructions which the agent is obliged to follow strictly. *National Bank of Washington v. Equity Investors*, 81 Wash.2d 886, 910, 506 P.2d 20, 35 (1973). A more exacting standard attaches, however, when the escrow agent engages in the practice of law.[13] *Bowers v. Transamerica Title Ins. Co.*, 100 Wash.2d 581,

588, 675 P.2d 193, 199 (1983). Here, Pope urges us to hold the Bank accountable to the higher standard. But the hard fact is that in these matters there is nothing to show that the Bank acted as an attorney, legally or otherwise.[14]

We cannot agree that the Bank's preparation of the escrow instructions renders it accountable as an attorney escrow agent. Although in cases where the escrow agent was deemed an attorney-escrow agent, *see Id.* at 585–86, 675 P.2d at 197; *In re Droker*, 59 Wash.2d 707, 709–10, 370 P.2d 242, 243 (1962), escrow instructions were among the documents prepared, we do not believe the Washington courts view the mere preparation of escrow instructions as the per se practice of law. *Cf. State Bar of Arizona v. Arizona Land Title & Trust Co.*, 90 Ariz. 76, 93, 366 P.2d 1, 12 (1961) (preparation of escrow instructions does not constitute the practice of law in Arizona). Escrow instructions, as a general rule, do not create legal rights and obligations as do earnest money agreements, deeds, deeds of trust, subordination agreements and promissory notes. Indeed, in *In re Droker* the Washington court spoke of deeds and notes as "legal instruments"[15] but not of escrow instructions. 59 Wash.2d at 710, 370 P.2d at 243.

the 80th condominium and monies paid to Quali–Built. All parties stipulated at trial that funds received by Quali–Built in unit sale proceeds and the value of the 80th unit constitute assets which may be deducted from Mercier's debt owing Pope, the sole owner of Quali–Built.

**13.** An attorney escrow agent, in addition to his duty to follow escrow instructions, must "also meet the standards of the legal profession, including those standards set forth in the Code of Professional Responsibility." *Bowers*, 100 Wash.2d at 588, 675 P.2d at 199. As the ethical considerations following the disciplinary rules of the Code make clear, an attorney must advise his clients of the risks of joint representation and of the right and wisdom of seeking independent counsel. Failure to so advise could render the attorney liable for conflict of interest. *See Model Code of Professional Responsibility*, DR 5–105 and EC 5–16.

**14.** More specifically, Pope claims the Bank engaged in the unauthorized practice of law. While the practice of law by an escrow agent may make out a violation of the Washington

Consumer Protection Act if it is unauthorized, *Bowers*, 100 Wash.2d at 591, 675 P.2d at 200, it is immaterial for our purposes here of defining the scope of the fiduciary duty owing Pope whether the Bank's acts were authorized or unauthorized. A lay escrow agent who engages in the unauthorized practice of law is held to the same standard of care as one who engages in the authorized practice of law. *Id.* at 590, 675 P.2d at 198.

**15.** The court's discussion of the escrow instructions immediately preceded its discussion of the "legal instruments." It should be noted that in *Droker*, the escrow instructions went beyond their usual function; they were designed to cure mistakes, inaccuracies, deficiencies and ambiguities in the underlying documents. Thus in *Droker*, the contract made by the earnest money receipt was changed by the superseding instructions. In that situation, to which Pope unsuccessfully analogizes, the instruments did create legal rights and obligations and thus their preparation constituted the practice of law. 59 Wash.2d at 719, 370 P.2d at 248. *See infra* pages 1351–52.

That escrow instructions are not listed among the documents in the Washington Limited Practice Rule for Closing Officers, APR 12(d) [16], also suggests this conclusion. Pope construes their absence as indicating that real estate brokers were already authorized to prepare escrow instructions on behalf of their clients because their preparation fell within the pro se exception to the unauthorized practice of law statute. This reasoning is simply wrong. The pro se exception, Washington courts have held, applies only to a party preparing documents on his own behalf, not to the gratis preparation of documents for others. *Hogan v. Monroe*, 38 Wash.App. 60, 65–66, 684 P.2d 757, 760–61 (1984).

Using logic and reason, which are the oldest and most effective judicial tools, *see Watkins v. United States Army*, 837 F.2d 1428, 1452 (9th Cir.1988) (Reinhardt, J., dissenting), *reh'g granted* 847 F.2d 1362 (1988), we may conclude that Washington courts saw no need to include escrow instructions in APR 12 because real estate agents have traditionally been preparing them without fear of recrimination. Simply put, their preparation does not and has not constituted the practice of law. The dearth of cases on this issue speaks just as loudly.

That is not to say that preparation of escrow instructions could never render an escrow agent accountable as an attorney. Though elusive of precise definition, the "practice of law" "includes 'legal advice and counsel and the preparation of legal instruments by which legal rights and obligations are established.'" *Washington State Bar Ass'n v. Great Western Union Fed. Sav. & Loan Ass'n*, 91 Wash.2d 48, 54, 586 P.2d 870, 875 (1978). Thus, if the

agent in his preparation of escrow instructions does create legal rights and obligations, he may not escape the standard of care applicable to the practice of law simply by labeling the document "escrow instructions." But such is not the case here.

The escrow instructions in the case *sub judice* are simple and unambiguous: they direct the Bank to record certain documents deposited with it and reflect Pope's agreement to release her interest in the first sixty-four units prior to receipt of any payment on Mercier's promissory note. Pope argues that these instructions, the latter in particular, do not accurately reflect the underlying agreement. Indeed, she argues, the transactional documents conflicted and that through the promissory note and the earnest money agreement, the Bank should have known that she intended to limit her subordination to the first sixty-four units. In her view, the Bank should not have closed the purchase and sale absent clarification and modification. Instead, the Bank drafted escrow instructions which failed to embody the limitation and the payment provisions. By these instructions, she reasons, the Bank modified the agreement, thereby creating legal rights and obligations.

An examination of the underlying documents reveals no such conflict.[17] The subordination agreement is complete and unambiguous: it is an agreement between Pope and the Bank, as lender, to subordinate in full her interest in the "Deerpark project." The payment provisions in the other documents reflect a promise by Mercier to pay Pope the indebtedness. As between Pope and the Bank, the subordination agreement controls.[18] Thus, the sub-

---

**16.** This rule lists those "legal documents" which real estate brokers may now prepare without fear of liability for engaging in the unauthorized practice of law.

**17.** The Earnest Money Agreement provided "Seller to subordinate to Purchaser or Lending Institution. Balance due Seller will be paid after the closing of the first 64 units of the proposed development has closed escrow." The promissory note, in pertinent part, provided that "D. Jean Pope will receive any and all monies from the sales of the eighty unit condo-

minium project after the sale of the 64th unit, but in no case will the payment of this note go past the due date of September 19, 1979." *See* note 4, *supra*, for the unambiguous language of the subordination agreement.

**18.** Pope argues that the Bank's rights under the subordination agreement were lost because the Bank did not perfect its interest under Article 9 of the UCC. This argument is confused. Article 9 is inapplicable to interests in real estate. *See* Official Comment 4 to UCC 9–102; *see especially* illustration to subsection (3).

ordination and payment provisions do not conflict because they are covenants by and between different parties.

Because there was no conflict, the Bank acted reasonably in drafting the escrow instructions as it did. It is by her own acts and omissions that Pope finds herself completely subordinated. The purpose of tendering the escrow instructions to the parties is to allow them to make changes in the event the escrow instructions are wrong, somehow incomplete, or do not reflect the often unstated, yet possibly valid, expectations of the parties. But Pope urges she did not read the instructions before signing them. In effect, Pope makes supplication to us to relieve her from the subordination agreement. This we cannot do where, as here, there was no overreaching and the seller was no novice to real estate matters. *Cf. Bowers*, 100 Wash.2d at 586, 675 P.2d at 198 (involving an unsophisticated seller who was overreached).

Indeed, the realities of the real estate business are such that, we think, as did the district court, the Bank would not have made the construction loan without holding the first lien on the entire development and Pope surely should have known this.[19] The fact that she agreed to release her interest in the first sixty-four units without receipt of payment reflects everyone's expectation that the Bank's lien would have been paid off in full after the sale of the sixty-fourth unit. Pope's advance execution of the request for reconveyance forms confirms the parties' recognition of the Bank's superior status and conforms to typical practice.[20] As it turned out, cost overruns did alter the financial forecast and required payment of the Bank's lien from sales of later units.

They did not alter, however, Pope's agreement to subordinate her interest to the Bank's.[21]

The only other instruments bearing the Bank's ink are the request for reconveyance forms on which the Bank supplied the property descriptions. The Bank did not become Pope's attorney escrow agent by reason of these acts. Indeed, it did not hold the documents or fill them in as her escrow agent. It held them instead on behalf of Mercier and only as a matter of course.[22] In this type of commercial transaction, where the Bank had conditioned its loan on obtaining the first lien, the developer is well-advised, as here Mercier was, to obtain in advance both the subordination agreement and the signed request for partial reconveyance forms. The request forms are given primarily on behalf of the developer to enable him to sell his units as they become ready. Without a release in hand from the junior lienholder, the developer would not be able to obtain the release of the senior lienholder and the units would not be sold. Although the Bank held these signed forms in its files, we think it did so for Mercier because he would necessarily have had to contact the Bank, as senior lienholder, for its release in each closing.[23] As a matter of logic and of law, Pope cannot rest on these actions as defining the Bank's role as attorney escrow agent.

Having established that the Bank is accountable only as a non-attorney escrow agent, we must now ask whether it breached the fiduciary duties owing Pope as seller-principal in the Pope–Mercier closing. Preliminary to this analysis, we must ask even a more basic question: what were the fiduciary duties owing her?

---

**19.** By its terms, the subordination agreement recognized this condition, providing in paragraph 6, "[i]t is understood by the parties hereto that 'lender' would not make the loan ... without this agreement."

**20.** Madison, *supra* note 5, § 7.05[2].

**21.** Had Pope refused to release her interest in the units, surely the Bank could have obtained her release either through threat of foreclosure or by judicial application. In Washington, condominiums are not allowed to be sold while still

subject to liens of the developer's creditors. Wash.Rev.Code 64.32.130; *see also* Madison, *supra* note 5, § 10.02[2][c].

**22.** M. Friedman, *Contracts and Conveyances of Real Property* § 6.8 (4th ed. 1984) (especially p. 758 n. 19: release is for developer's benefit).

**23.** It is not atypical for a construction lender to require the subordinator to deliver in advance the request forms. *See* Madison, *supra* note 5, § 7.05[2].

■ We have already alluded to the fact that a non-attorney escrow agent's duties are much narrower than an attorney escrow agent's. The non-attorney escrow agent must strictly comply with the escrow instructions and may not exceed his authority. *Equity Investors*, 81 Wash.2d at 910, 506 P.2d at 35. Pope claims, *inter alia*, that the Bank failed to follow the escrow instructions by not disbursing sale proceeds in accordance with the terms of the Earnest Money Agreement and the Promissory Note. This contention reveals her most basic misunderstanding in this case. Under her view, the escrow was to continue until sale of the units, disbursement of the proceeds and satisfaction of the liens. But the deal was not structured this way. The closing of the Pope–Mercier purchase and sale was completed upon satisfaction of the only condition, issuance of a title report. Thereafter, the Bank did all that it was required, indeed authorized, to do: it recorded the documents placed in escrow. Having done so, we find the Bank strictly and fully complied with the mandates of the escrow instructions.

Nowhere in these documents or in the escrow instructions in the Pope–Mercier closing is there any direction to the escrow agent concerning collection or disbursal of proceeds. It was only through the Bank's role as escrow agent in the later closings of individual condominiums that it controlled the disbursement of sale proceeds. And the instructions governing disbursement of sale proceeds in these closings made no mention of discharge of the indebtedness owing Pope by Mercier.[24]

Pope fails to recognize the distinction between the Bank's role as escrow agent in the Pope–Mercier closing and its role as escrow agent in the later sixty-three closings. Contrary to her assertions, the Bank's escrow agency with her did not extend past the Pope–Mercier closing.

There was no agreement that the Bank would close all of the sales of the units and thus be responsible for distribution of all of the proceeds. Indeed, the Bank did not close sixteen of the unit sales. Certainly, competent counsel could have structured the deal to conform to her expectations, but we cannot relieve her of the legal effect of documents which she signed and had the opportunity to read. *Skagit State Bank v. Rasmussen*, 109 Wash.2d 377, 381–82, 745 P.2d 37, 39–40 (1987). Her claim that the Bank failed to follow the escrow instructions is without foundation in fact.

This and our earlier reasoning negate the necessity of dispelling the other arguments Pope makes regarding the Pope–Mercier closing, all of which presuppose a non-existent conflict between the underlying documents. Her remaining arguments of breach of fiduciary duty are equally flawed and merit only brief mention here.

■ First, she urges us to find a breach by reason of the Bank's failure to advise her of the legal consequences of the unlimited subordination agreement. Her reasoning on this point is perverse: she would have us hold that the Bank was duty-bound to give legal advice, when, had it done so, it would necessarily have engaged in the unauthorized practice of law. *See Equity Investors*, 81 Wash.2d at 911, 506 P.2d at 36.

■ Second, Pope again notes that the Bank filled in the property descriptions, but now she relies on this fact to establish breach of duty rather than to establish the attorney escrow agency. When the Bank filled in these forms, it could have been acting either on behalf of Mercier as developer, as it did in holding the forms, or as escrow agent in the sixty-three closings.[25] But even if the Bank acted pursuant to its duties as escrow agent, we are clear that no fiduciary duty was then owing Pope and hence there was no breach. Pope was not

---

24. Mercier gave the Bank two sets of instructions as representative of the seller-principal of the units, Quali–Built. Basically, the instructions provided that 85% of the proceeds were to be applied to satisfaction of Mercier's indebtedness to the Bank and the remaining 15% to other expenses. No portion of the proceeds was

directed to go to satisfy Mercier's indebtedness to Pope.

25. Under the latter view, Mercier would have deposited the form with the Bank as escrow agent.

a party to these closings; at best, she was an incidental third-party beneficiary by virtue of her status as junior lienholder.[26] *Cf. Boise Cascade Corp. v. Pence*, 64 Wash.2d 798, 803, 394 P.2d 359, 362 (1964) (noting the distinction between incidental and intended third-party beneficiaries); *accord Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 330, 357 N.E.2d 983, 985 (1976) (same). Pope cannot sue in tort for breach of fiduciary duty on the basis of any actions undertaken by the Bank as escrow agent in these individual closings because no duty was then owing her.

Thus, we do not consider her other arguments that the Bank erred when it relied on the mailgram and instructed Ticor to release Pope's interest in the sixty-fifth through seventy-ninth units.[27]

Whether the Bank acted as attorney escrow agent was a question of law properly before the court. Having made a de novo review, we affirm the court's ruling that the Bank did not engage in the practice of law. We also affirm the court's directed verdict in favor of the Bank on the tort issue, because no reasonable jury could have found otherwise. *Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

## IV  EXCUSING THE JURY

After granting the Bank's motion for directed verdict on the tort claim, the district court discharged the jury, believing both parties had consented to trying the contract claim to the bench. Pope's counsel now claims that he misunderstood the judge's comments and that he "sought as quickly as possible to bring the problem to the court's attention." He therefore argues he did not knowingly consent to a waiver of the right to a jury trial.

The record indicates that the original suggestion to excuse the jury came from Pope's counsel. Before argument on the Bank's motion for directed verdict, Pope's counsel intimated he was done with the jury:

> We rested on the first part of the case and not on the part of the case which is to be tried to the Court on the foreclosure action.[28]

Tr. May 17, 1985 at 995.

Thereafter, in making its ruling on the motion for directed verdict, the court stated:

> I think probably what we should do is to get the jury up and tell them I've made certain rulings that make them all—you know—that the rulings are then to be made by me and we'll carry on with me without telling them anything more about the case.

*Id.* at 1031–32. Were this the only comment made by the judge, Pope's alleged confusion would be understandable. But after making this statement, the court engaged in continued discussions with counsel concerning the issues as to which the court was going to direct the verdict. Then, the court unequivocally stated, "I think what I should do is call the jury up now and then excuse them and then come back to you and decide how we go ahead." *Id.* at 1034. Counsel's sole response was "Thank you."

To the jury the court then said, "... the burden is now upon me to decide all these facts rather than upon you. So it may be a

---

**26.** We note that we are unclear as to whether she even retained the status as an incidental third-party beneficiary because, through her subordination agreement, she had already agreed to subordinate her interest to the Bank's. To the extent that the Bank's debt had not been satisfied, surely Pope's interest in the proceeds was remote. As this matter is not before us, we express no opinion other than to note that our statements in the text do not represent a clear determination of her status.

**27.** If any fiduciary duty was violated in releasing her deed of trust, it would have been by Ticor, the trustee. Ticor, in turn, may have had an action for indemnity against the Bank if the Bank did indeed misrepresent its authority.

**28.** Reference to foreclosure encompasses the claims unrelated to this appeal: there were other defendants in the trial below. For our purposes, we believe counsel's statement reasonably led the judge to believe the remaining issues, wrongful disbursement included, were to be tried to the bench.

disappointment to you, but I am now going to excuse you. You can kind of wipe all the facts out of your mind and not worry about how this comes out." *Id.* at 1034–35. One juror asked, "We're not coming back this afternoon?" The court answered, "No. You are excused. That is, I have no longer a need for your services. All the issues that now remain will be decided by me and not by you." *Id.* at 1035. After the jurors left, the court discussed with counsel the length and necessity of expected testimony on the remaining issues and then recessed for lunch.

It was not until after lunch that counsel complained for the first time that the jury had been improperly discharged. He claimed to have thought that "you [the judge] were going to send them home for the day." *Id.* at 1043. Counsel admitted, however, that he did realize the jury was being discharged when the judge told them to go home and not to come back. "At that time I knew," he confessed. *Id.* at 1044. When the judge questioned why he didn't stand on his feet and object then, he explained that he did not know if it was "at all proper to stand up while the Court was discharging the jury." *Id.*

■ We disagree that Pope's counsel's confusion was reasonable and his objections timely.

Under these circumstances, we find conduct evincing consent sufficient to constitute a waiver of the right to trial by jury. Fed.R.Civ.P. 39(a); *Palmer v. United States*, 652 F.2d 893, 896 (9th Cir.1981). Here, we have much more than silence where objection was both proper and neces-sary to protect a client's important right.[29] We have counsel's statement that he was done with the jury, his apparent agreement with the court's announced intent, actual knowledge that the jury was being discharged, continued colloquy with the court and opposing counsel after the jury had left, and failure to protest until well over an hour and a half after the jury had gone.[30]

## V  WRONGFUL DISBURSEMENT

The court heard four additional days of testimony on Pope's claim that the Bank acted wrongfully in using unit sale proceeds to discharge its $60,000 loan to Mercier before discharge of Mercier's debt to Pope. In her view, the subordination agreements, even if not limited to the first sixty-four units, did not cover the third loan made by the Bank because the last loan was an optional advance and as such was not covered by the advance clauses. The court found in favor of the Bank without addressing the scope of the advance clause. It found, as trier of fact, that Mercier's $274,000 debt to Pope had been completely discharged and thus that Pope's deed of trust no longer secured any indebtedness from Mercier to Pope when the Bank applied unit sale proceeds to discharge of the $60,000 loan.[31] We must affirm the court's ruling on this claim unless its finding that the debt had been completely discharged was clearly erroneous. Fed.R.Civ.P. 52(a); *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469

**29.** We are mindful that attorneys accord the bench much respect and do not desire to discourage this wise and greatly appreciated practice, but the totality of the circumstances here manifests that the attorney slept on his client's rights. He may not use decorum and respect for the court as a double-edged sword to resurrect voluntarily relinquished rights.

**30.** Pope claims and the Bank denies that Pope made a request for relief. Even had such a request been made, *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668 (9th Cir.1975), we do not think under these circumstances that the judge would have abused its discretion in denying it. It was Pope's counsel's conduct which invited the ensuing events and by the time counsel's putatively true intentions became known, the jury had departed for places unknown. It was a Friday afternoon when the jury was discharged; it is certainly possible that one of the twelve welcomed the break after six days of tedious testimony and left for a vacation. The burden of such a request at this late hour would have been too great on the court, given the circumstances.

**31.** Once a debt has been repaid, the security interest which was given to secure the repayment of the loan cannot be enforced. *Kvame v. Patrick*, 57 Wash.2d 343, 345, 357 P.2d 167, 169 (1960).

U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). It was not.

Evidence shows that between October 1979 and January 1980, Mercier quit-claimed the Deerpark property and the seven acres adjoining it to Quali–Built and to Pope, respectively. The court found that these two conveyances completely discharged Mercier's indebtedness to Pope. Pope argues the Deerpark property was given Quali–Built as recompense for its large outlays for the unexpected cost over-runs and that the adjoining seven acres was deeded Pope as "additional collateral" in exchange for her agreement to extend the due date on the promissory note and to assume the underlying mortgage. As additional consideration, she claims that she agreed to release to Mercier her interest in certain real property in Anchorage and to assist in financing another condominium project which was to belong solely to Mercier upon completion.[32]

■ The court found Pope's testimony not credible. At trial, deposition testimony was introduced in which Pope admitted in an unrelated proceeding that the seven acres had been given as payment for the $274,000 debt. Pope argues this testimony was introduced only to impeach her and cannot be used as substantive evidence. We disagree. Under Fed.R.Civ.P. 32(a)(2) and Fed.R.Evid. 801(d)(1), prior inconsistent statements given in a prior proceeding under oath may come in as substantive evidence. *United States v. Morgan*, 555 F.2d 238, 242 (9th Cir.1977) (grand jury testimony admissible); *United States v. Castro–Ayon*, 537 F.2d 1055, 1057–58 (9th Cir.) (defining broadly "other proceeding" in 801(d)(1)), *cert. denied*, 429 U.S. 983, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976). We reject any suggestion that lawyers must recite formal incantations of each intended use and application of proffered evidence.

■ The evidence reveals that the court's finding was adequately supported.

It appears from the deed, the October 8 agreement previously mentioned, and the evidence showing that Pope and Mercier were closely associated, along with common business sense, that the seven acres were indeed given as payment, in part or in full we do not know, of the $274,000 debt. The actual value of the property at the time of the transfer, a vigorously contested fact, is immaterial. We recall the first lesson in contracts, the peppercorn theory—that courts will not inquire into the adequacy of consideration, so long as it was true and valuable. And here, we think it was. Furthermore, there was also the conveyance of the Deerpark property to Quali–Built, on which the court also relied in making its finding. We agree that this corporation was Pope's alter ego; Pope admitted as much when she conceded that Mercier's debt to her individually had been reduced by the value of the condominium and other payments given to Quali–Built after the Bank had been repaid. Thus, we conclude the court's finding that the debt had been completely discharged was not clearly erroneous. Accordingly, resolution of the effect of the advance clauses and of their bearing on the Bank's duties in disbursing sale proceeds is unnecessary.

## VI PRETRIAL AND OTHER PROCEDURAL MATTERS

A pretrial order was lodged on April 9, 1985, one month before trial commenced. Some three weeks later, the Bank moved to amend the order, claiming newly discovered evidence revealed that Pope's debt had been repaid. Pope objected to amendment at this late date and moved on the first day of trial, before the court had ruled on the motion to amend, for judgment on the pretrial order as it then existed. The court first denied Pope's motion and then granted the Bank's. We affirm both rulings.

■ Whether Pope's motion for judgment is properly viewed as a motion for judgment on the pleadings or as one for

---

**32.** At trial, Pope produced evidence of the payments she subsequently made on the real estate contract encumbering the land. She also produced expert estimony that the value of the seven acres fell far short of Mercier's indebtedness to her. Needless to say, the Bank presented evidence showing the property's value at some figure $700,000 in excess of that testified to by Pope's experts.

summary judgment, this court reviews the district court's determination de novo. *Operating Eng'rs Pension Trust v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 561 (9th Cir.1984). Denial of the motion was proper because Pope did not give the Bank proper notice of its motion under either Fed.R.Civ.P. 6(d) (requiring 5 days' notice) or Fed.R.Civ.P. 56(c) (requiring 10 days' notice). The Bank did not waive this technical defect by failing to object below; the Bank's counsel, unlike the counsel in the cases cited by Pope, did not actively participate in the oral argument on the motion in the district court. *Cf. Thacker v. Whitehead*, 548 F.2d 634, 636 (6th Cir.1977); *Spence v. Latting*, 512 F.2d 93, 97 (10th Cir.), *cert. denied*, 423 U.S. 896, 96 S.Ct. 198, 46 L.Ed.2d 129 (1975).[33]

■ The Bank's motion to amend as noted above was based on newly discovered evidence: the deposition mentioned earlier containing Pope's damaging admission of payment. However, Pope, pointing out that the district court's grant of the motion negated an admitted fact (No. 46) that the debt had not been repaid,[34] argues that the district court abused its discretion by failing to consider the prejudice amendment would occasion.[35]

There is no doubt that the ruling prejudiced Pope; it required her to prove that she actually suffered damages. The trial judge, however, did consider the resulting prejudice. He did not allow amendment on the strength of the admission alone but spent considerable time questioning the Bank's counsel to ascertain why the matter was raised so late. Satisfied that the Bank's counsel acted in good faith and that the motion was not advanced to surprise Pope at trial, the judge granted the motion and emphasized that because the key witness was Pope herself and she was present, she would have the opportunity to explain her earlier sworn testimony. No abuse of discretion appears.

Pope's motion for a new trial raised essentially the same arguments she urges on appeal. Accordingly, its denial did not constitute an abuse of discretion.

Both parties seek attorney's fees and costs. As Pope is not the prevailing party, we deny her request. We grant the Bank's request, as did the district court, on the basis of a provision in the escrow instructions that allows for such recovery for any litigation arising out of the escrow agency. *See also* Wash.Rev.Code § 4.84.330.

AFFIRMED. Attorneys' fees and costs to defendant Bank.

---

**33.** We also find denial of the motion proper on the alternative ground that there still remained questions of fact unresolved by the pretrial order (even assuming the truth of Pope's contention that her loan had not been repaid).

**34.** The amendment added Factual Contention No. 21 which read, "Pope received a Quit Claim Deed to the adjacent seven-acre parcel as additional collateral for the payment of the $274,000 debt, or as payment of the debt itself."

**35.** Normally, amendment is allowed only to prevent manifest injustice. Fed.R.Civ.P. 16(e); *Ma-*

*lhiot v. Southern California Retail Clerks Union*, 735 F.2d 1133, 1137 (9th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985). In ruling on such a motion, this circuit has stated that the trial judge should consider four factors; prejudice to the non-moving party is one of the factors. *United States v. First Nat'l Bank of Circle*, 652 F.2d 882, 887 (9th Cir.1981). The court reviews a district court's decision to allow amendment for abuse of discretion. *Acorn v. City of Phoenix*, 798 F.2d 1260, 1272 (9th Cir.1986).